IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NICHOLAS OLENIK, Individually and on Behalf of All Others Similarly Situated, | § § § § | No. 392, 2018 |
| Plaintiff Below, Appellant, | § § § | Court Below—Court of Chancery of the State of Delaware |
| v. | § § | C.A. No. 2017-0414-JRS |
| FRANK A. LODZINSKI, RAY SINGLETON, DOUGLAS E. SWANSON, BRAD THIELEMANN, ROBERT L. ZORICH, JAY F. JOLIAT, ZACHARY G. URBAN, ENCAP INVESTMENTS L.P., BOLD ENERGY III LLC, BOLD ENERGY HOLDINGS, LLC and OAK VALLEY RESOURCES, LLC, | § § § § § § § § § § § § § | |
| Defendants Below, Appellees, | § § § | |
| and | § § | |
| EARTHSTONE ENERGY, INC., a Delaware Corporation, | § § § § | |
| Nominal Defendant Below, Appellee. | § § § | |

Submitted: February 6, 2019
Decided: April 5, 2019
Revised: April 11, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, and **SEITZ**, Justices.

Upon appeal from the Court of Chancery of the State of Delaware: **AFFIRMED IN PART, REVERSED IN PART,** and **REMANDED**.

Jeremy S. Friedman, Esquire, Spencer Oster, Esquire, and David F.E. Tejtel, Esquire, Friedman Oster & Tejtel, PLLC, New York, New York; Ned Weinburger, Esquire (*argued*), and Thomas Curry, Esquire, Labaton Sucharow LLP, Wilmington, Delaware; Peter B. Andrews, Esquire, Craig J. Springer, Esquire, and David Sborz, Esquire, Andrews & Springer LCC, Wilmington, Delaware, for Appellant, Nicholas Olenik.

Kenneth J. Nachbar, Esquire (*argued*), D. McKinley Measley, Esquire, and Lauren Neal Bennett, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Gerard G. Pecht, Esquire, Norton Rose Fulbright US LLP, Houston, Texas; Peter A. Stokes, Esquire, and William Patrick Courtney, Esquire, Norton Rose Fulbright US LLP, Austin, Texas, for Appellees Frank A. Lodzinski, Ray Singleton, Bold Energy III LLC, and Earthstone Energy, Inc.

Rolin P. Bissell, Esquire, and James M. Yoch, Jr., Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Michael C. Holmes, Esquire, Craig E. Zieminski, Esquire, Stephen S. Gilstrap, R. Kent Piacenti, Esquire, and Jeffrey Crough, Esquire, Vinson & Elkins LLP, Dallas, Texas for Appellees Douglas E. Swanson, Brad Thielemann, Robert L. Zorich, EnCap Investments L.P., Bold Energy Holdings, LLC, and Oak Valley Resources, LLC.

2

**SEITZ**, Justice:

Nicholas Olenik, a stockholder of nominal defendant Earthstone Energy, Inc., brought class and derivative claims against the defendants challenging a business combination between Earthstone and Bold Energy III LLC.  As alleged in the complaint, EnCap Investments L.P. controlled Earthstone and Bold and caused Earthstone stockholders to approve an unfair transaction based on a misleading proxy statement.  The defendants moved to dismiss the complaint on several grounds.  They claimed that the proxy statement disclosed fully and fairly all material facts about the transaction, and Earthstone conditioned its offer on the approval of a special committee and the vote of a majority of the minority stockholders.  Thus, under *Kahn v. M&F Worldwide Corp.*,[1] instead of the exacting entire fairness standard of review, business judgment review should apply leading to dismissal.

The Court of Chancery agreed with the defendants and dismissed the case.  Two grounds were central to the court's ruling.  First, the proxy statement informed the stockholders of all material facts about the transaction.  And second, although the court recognized that EnCap, Earthstone, and Bold worked on the transaction for months before the Earthstone special committee extended an offer with the so-called

---

[1] 88 A.3d 635 (Del. 2014).

3

*MFW* conditions, it found those lengthy interactions "never rose to the level of bargaining: they were entirely exploratory in nature."[2] Thus, in the court's view, the *MFW* protections applied, and the transaction was subject to business judgment review resulting in dismissal.

While the parties briefed this appeal, we decided *Flood v. Synutra International, Inc.*[3] Under *Synutra*, to invoke the *MFW* protections in a controller-led transaction, the controller must "self-disable before the start of substantive economic negotiations."[4] The controller and the board's special committee must also "bargain under the pressures exerted on both of them by these protections."[5] We cautioned that the *MFW* protections will not result in dismissal when the "plaintiff has pled facts that support a reasonable inference that the two procedural protections were not put in place early and before substantive economic negotiations took place."[6]

The Court of Chancery held correctly that the plaintiff failed to state a disclosure claim. But, the complaint should not have been dismissed in its entirety. Applying *Synutra* and its guidance on the *MFW* timing issue—which the Court of Chancery did not have the benefit of at the time of its decision—the plaintiff has

---

[2] *Olenik v. Lodzinski*, 2018 WL 3493092, at *16 (Del. Ch. July 20, 2018).
[3] 195 A.3d 754 (Del. 2018).
[4] *Id.* at 763.
[5] *Id.*
[6] *Id.* at 764.

pled facts supporting a reasonable inference that EnCap, Earthstone, and Bold engaged in substantive economic negotiations before the Earthstone special committee put in place the *MFW* conditions. We also find no merit to the defendants' alternative ground for affirmance based on EnCap's supposed lack of control of Earthstone. The Court of Chancery's decision is affirmed in part and reversed in part, and the case remanded for further proceedings consistent with this opinion.

## I.

### A.

According to the allegations of the complaint, which we accept as true at this stage of the proceedings, nominal defendant Earthstone is an upstream oil and gas company developing domestic oil and gas reserves. EnCap is a Delaware limited partnership operating as a private equity and venture capital firm focusing on domestic oil and gas ventures. EnCap had two holdings relevant to this appeal— Oak Valley Resources, LLC, a Delaware limited liability company, which in turn owned a controlling stake in Earthstone; and Bold, a Texas limited liability company controlled by EnCap with substantial undeveloped oil and gas resources in Texas and New Mexico.

Frank Lodzinski founded Oak Valley in 2012, and served as its president and chief executive officer. Lodzinski and EnCap have a history of successful

5

investments in the oil and gas industry. EnCap came to control Oak Valley through a reverse merger when EnCap contributed membership interests in three subsidiaries in exchange for a controlling interest in Earthstone. Lodzinski and three other members affiliated with EnCap made up four of the five Oak Valley board of managers. Affiliates of EnCap had the contractual right to nominate a majority of the Oak Valley board of managers.

From December 2014 through June 2016, EnCap owned more than 50% of Earthstone through its majority membership interest in Oak Valley. After a 2016 reverse merger involving Earthstone and Oak Valley, Oak Valley's ownership interest in Earthstone dropped to 41%. The following chart shows Earthstone's corporate structure post-2016 reverse merger:



After investing in December 2014, EnCap installed new Earthstone management, with Lodzinski as president and chief executive officer. Earthstone also employed several individuals who work for an Oak Valley affiliate. At this point, EnCap and certain of its affiliates "through their direct and indirect ownership may be deemed to share the right to direct the disposition of the Common Stock held by Oak Valley through the EnCap Oak Valley Funds' interest in Oak Valley and

7

EnCap Fund IX's ownership of Bold."[7]  In its 10-K report following the 2016 reverse merger, Earthstone stated that it remained a controlled company:

> So long as OVR [Oak Valley] continues to control a significant amount of our common stock, OVR will continue to be able to strongly influence all matters requiring stockholder approval, regardless of whether or not other stockholders believe that a potential transaction is in their own best interests. In any of these matters, the interests of OVR may differ or conflict with the interests of our other stockholders. Moreover, this concentration of stock ownership may also adversely affect the trading price of our common stock to the extent investors perceive a disadvantage *in owning stock of a company with a controlling stockholder*. As of March 1, 2017, OVR controls 9,162,452 shares of our common stock, or 41.1% of the outstanding shares.[8]

## B.

Turning to the transaction at issue in this appeal, the Earthstone-Bold business combination has its roots in mid-2015 when EnCap began looking for ways to sell Bold or take it public.  The plaintiff's theory is that Bold required large capital commitments from EnCap's investment funds to sustain its oil and gas operations.  In the summer of 2015, EnCap reached the end of its capital commitments, was hesitant to invest more capital into Bold, and saw problems taking Bold public.[9]  EnCap retained an investment banker "to determine whether there was a market for Bold's assets."[10]  The banker came up dry due to falling oil and gas prices.

---

[7] App. to Opening Br. at A254, 274, 314, 354 (Proxy Statement, at 10, 30, 69, 106).
[8] *Id.* at A642 (Annual 10-K at 27-28, filed March 15, 2017) (emphasis added).
[9] *Id.* at A68 (Am. Compl. ¶ 67).
[10] *Id.* at A290 (Proxy Statement, at 45).

According to the plaintiff, EnCap had run out of options to meet Bold's heavy capital requirements and keep Bold afloat. Even with the final capital call from EnCap, "Bold d[id] not have enough cash and drilling capacity to continue to run the company . . . ."[11]

Meanwhile, Earthstone in 2014-15 was pursuing a number of acquisitions, which led to its interest in an Earthstone/Bold transaction. In the fall of 2015 Lodzinski saw an opportunity to combine Earthstone's cash-generating assets with Bold's undeveloped resources. He initiated discussions with EnCap about a possible Earthstone-Bold transaction which, according to the plaintiff, was done without informing the Earthstone board. Those early interactions included:

- 11/2015 – EnCap provided Lodzinski and Earthstone management with Bold's marketing pitchbook followed by a conference call with EnCap to discuss a business combination. Earthstone and EnCap entered into a confidentiality agreement covering Bold's internal information. Bold shared financial information with Earthstone, which included access to Bold's data room set up from the earlier unsuccessful market survey.

- 11-12/2015 – Earthstone contacted Bold's investment banker and Earthstone's and Bold's technical employees met with a consultant to discuss Bold's assets. Earthstone and Bold entered into another confidentiality agreement covering Bold technical, operational, financial, and analytical information prepared by Bold and its investment banker, followed by a banker presentation presenting a technical overview of Bold's assets to EnCap and Earthstone, and a follow up meeting among the same parties.

---

[11] *Id.* at A743 (Minutes of a Meeting of the Special Committee, July 22, 2016).

9

- 12/15-1/16 – Lodzinski and Earthstone management met with investment banking firms "to solicit their views on valuation parameters related to Bold's assets, methods to fund their development, and equity market receptivity to potential acquisition of Bold's assets."[12]

C.

Earthstone and EnCap put their discussions on hold in early 2016 when oil prices reached a twelve-year low. But, in April 2016, Lodzinski rekindled his interest in Bold and provided Earthstone's board with a letter discussing Earthstone's operations. In that April 27 letter, Lodzinski described a transaction with Bold as a "Current Deal[]," noted he was "updating analysis," and also wrote "intend to make offer."[13] For the next few months Lodzinski led substantive financial discussions among EnCap, Earthstone, and Bold about a transaction:

- 05/02/2016 – EnCap provided Earthstone more information on Bold's projects and "indicated it would begin to build an independent evaluation model of Earthstone and Bold" to use "in evaluating any potential business combination."[14]

- 05/11/2016 – Without assistance from an independent financial advisor, Earthstone delivered a presentation to EnCap proposing an equity valuation for Bold of approximately $305 million in Earthstone common stock.[15]

---

[12] *Id.* at A71 (Am. Compl. ¶ 75).
[13] *Id.* at A740 (Apr. 27, 2016 Letter from Lodzinski to Earthstone Board of Directors, at 7).
[14] *Id.* at A292 (Proxy Statement, at 47).
[15] *Id.* at A76 (Am. Compl., ¶ 86).

- 05/18/2016 – Earthstone revised their proposed valuation to $335 million after EnCap apparently made no response.[16]

- 05/23/2016 – Earthstone granted EnCap access to its corporate data room which included a combined corporate model of Earthstone and Bold and an Earthstone net asset value model.[17] Bold got access a month later.

- 06/03/2016 – Earthstone and Bold officers discussed "a suggested action plan to be carried out during the ensuing weeks and months, relating to a possible transaction."[18]

- 06/27/2016 – Earthstone and Bold management met to go over Bold's assets and visited some Bold operations.[19]

- 07/06/2016 – Earthstone, EnCap, and EnCap counsel met "to develop a preliminary timeline to complete a possible transaction, identify the participants and their counsel, and assign responsibilities to complete the proposed transaction."[20]

## D.

On July 8, 2016—over two months after Earthstone and EnCap restarted discussions about a potential deal and almost eight months after the initial discussions between Lodzinski and EnCap—Earthstone's two independent directors, Joliat and Urban, held a conference call with Earthstone management and Earthstone's legal counsel. Joliat and Urban said they would form a special committee to oversee the potential transaction.

---

[16] *Id.* at A77 (Am. Compl., ¶ 88). This increase was allegedly due to some recently acquired assets of Bold not included in the first evaluation. *Id.* at A292 (Proxy Statement, at 48).

[17] *Id.* at A292 (Proxy Statement, at 47).

[18] *Id.* at A293 (Proxy Statement, at 49).

[19] *Id.* at A79 (Am. Compl. ¶ 92).

[20] *Id.* at A293 (Proxy Statement, at 48).

While the board was in the process of forming the special committee, substantive discussions continued over the transaction. On July 12, 2016, Lodzinski met with Bold's chief financial officer and executive vice president for business development to discuss, among other things, employee matters and the future composition of the combined board.[21] On July 19, 2016, Earthstone employees met with Bold representatives and toured some Bold facilities.[22] And, on July 22, 2016, Lodzinski and Anderson made a presentation to the unofficial special committee members about the status and plan for the transaction, including information about what Earthstone would do with Bold's assets, an updated valuation of Bold reflecting a value between $300 and $350 million, possibly structuring the deal using an initially tax-free "Up-C" structure, and a possible tax receivable agreement that would benefit EnCap that Earthstone was working on with EnCap's outside counsel.[23] Operational and technical employees of the two companies also continued to meet and visit Bold's drilling locations in West Texas.[24]

On July 29, 2016, the Earthstone board formally established the special committee consisting of Joliat and Urban. According to the proxy statement, the special committee's charter gave the committee the power to:

---

[21] *Id.*

[22] *Id.* at A294 (Proxy Statement, at 49).

[23] *Id.* at A742-44 (July 22, 2016 Minutes of a Meeting of the Special Committee).

[24] *Id.* at A294 (Proxy Statement, at 49).

(i) "determine whether or not to make a formal offer of combination with Bold and if so, the terms and conditions of such offer;

(ii) negotiate and oversee the documentation of any such offer;

(iii) retain its own financial advisor and legal counsel;

(iv) solicit the views of, and obtain information from, Earthstone's executive, financial and other officers; and

(v) reject the potential transaction, cease further negotiations and 'walk away.'"[25]

The charter also provided that the Earthstone board would not approve a transaction without the special committee's favorable recommendation.[26] There was not, however, a condition that any transaction be approved by a majority-of-the-minority stockholder vote. About the same time, the special committee selected Stephens Inc. as its financial advisor.

On August 10, 2016, the full board held a regularly scheduled meeting to discuss the transaction. According to management-prepared discussion materials, the plan was to "Announce Project Boldstone" in the third or fourth quarter.[27] During the meeting, "the directors discussed the potential Bold transaction and its pro forma financial and operational impact on Earthstone."[28] Like the board's previous meeting in May, the board held the meeting at EnCap's offices and was

---

[25] *Id.*
[26] *Id.*
[27] *Id.* at A88 (Am. Compl. ¶ 111).
[28] *Id.* at A295 (Proxy Statement, at 50).

attended by the same two EnCap employees who attended the previous meeting. "All directors were supportive of a transaction between Earthstone and Bold and directed the proper officers to continue to pursue such a transaction."[29]

On August 16, 2016, the special committee met with its counsel and Stephens to receive Stephens's preliminary financial analysis and discuss the terms of an offer to Bold. Although the minutes of the meeting state that "the deal currently being contemplated by [Earthstone] includes an equity split of 60% for Bold and 40% for [Earthstone]," Stephens's "contribution analysis show[ed] that the average contribution is 37.2% for Bold and 62.8% for [Earthstone]."[30] The Stephens representative stated that "the Committee should be aware that the contribution analysis does not support the currently proposed split between [Earthstone] and Bold."[31] He also noted that Earthstone's projections were based on a 10% discount to the stock price and that he was "not sure why such a discount would be used in this case."[32]

Later that same day, the special committee met with Earthstone management to continue discussions about the transaction. The committee discussed, "among other matters, the proposed transaction, recent transactions in the Midland Basin,

---

[29] *Id.*
[30] *Id.* at A89 (Am. Compl. ¶ 113).
[31] *Id.*
[32] *Id.* at A90 (Am. Compl. ¶ 114).

14

competition, management's current views on valuation and contribution analysis, the sources of the information provided to Stephens, anticipated market impacts on Earthstone and submission of a proposal to Bold."[33]

On August 19, 2016, the special committee met again about the transaction. According to the minutes, the committee "determined that the price of the Company's stock in the transaction should not be calculated at a discount, the weighted average trading price for the 30 days prior to signing should be used to determine the Company's stock price," and "the transaction should result in the Company [Earthstone] owning more than 40% of the resulting entity," with a $325 million purchase price based on Bold's enterprise value.[34] The minutes further suggest that the special committee reduced the amount Earthstone would own in the resulting entity from Stephens's earlier analysis because that earlier analysis did not estimate Bold's cash flows far enough into the future. In other words, Bold was an early-stage company with long-term potential but uncertain short-term prospects. The committee then authorized Lodzinski to send an offer letter to Bold.

E.

Lodzinski sent a formal written proposal to Bold's President, Castillo (the "August 19 Letter"). Consistent with the special committee's instructions, the

---

[33] *Id.* at A295 (Proxy Statement, at 50).
[34] *Id.* at A90 (Am. Compl. ¶ 115) (emphasis omitted).

August 19 Letter proposed to acquire all of Bold's assets and liabilities through "a private stock transaction with a face value of $325 million funded through the issuance of shares of Earthstone's common stock," less net financial obligations not to exceed $25 million.[35]  According to the proxy statement, assuming an equity valuation of $300 million for Bold and $10.50 per share for Earthstone stock, "the offer would have resulted in Bold owning about 55% of the combined entity on a fully diluted basis."[36]  The August 19 Letter also conditioned the transaction on approval by the special committee and, apparently for the first time, "Earthstone's stockholders, including the holders of a majority of the common stock held by persons other than EnCap Investments LP and its affiliates and associates."[37]

Five days after the special committee sent the August 19 Letter, Lodzinski met with Castillo to discuss Earthstone's offer and "begin more detailed negotiations on the broader terms of the proposed transaction."[38]  A week later, Castillo formally responded to Earthstone's proposal.  Bold's counteroffer called for Bold to own 65.5% of the combined company.

---

[35] App. to Opening Br. at A748 (Letter from Frank Lodzinski to Joseph L. Castillo).
[36] Id. at A295 (Proxy Statement, at 50).
[37] Id. at A748 (Letter from Frank Lodzinski to Joseph L. Castillo).  The plaintiff claims that Earthstone did not produce the August 19 Letter as part of the § 220 demand response, is not incorporated by reference in the complaint, and therefore, should not be considered by this Court on a motion to dismiss.  Earthstone responds that the letter was produced before the plaintiff filed his complaint.  We do not have to resolve this dispute because it does not affect our analysis.
[38] Id. at A92-93 (Am. Compl ¶ 120).

The special committee considered Bold's counteroffer at two meetings with its advisors on September 1 and September 6, 2016. At the second meeting, Stephens advised the special committee that "the Company should try to end up at approximately 40%" of the combined entity (*i.e.*, 60% for Bold).[39] The special committee agreed, and on September 8, 2016, authorized Lodzinski to offer Bold 60% of the combined entity.

Castillo responded the next day to Earthstone's counteroffer. His position was that Bold should end up with 62.5% of the combined entity. Before the special committee had a chance to digest this new offer, Lodzinski spoke to Castillo about the offer. During this discussion, Lodzinski hinted "that Earthstone might be able to increase its proposal," and thereby increase Bold's ownership of the combined entity to 61.5%.[40] Castillo was receptive to an offer in that range.

Based on his conversation with Castillo, Lodzinski spoke with Joliat and encouraged him to consider accepting a deal at less than 40% ownership of the combined entity. Joliat reported this conversation to his special committee colleague at a September 13, 2016 meeting, but Stephens advised that "the Company should attempt to negotiate for a transaction that results in an ownership percentage of at least 40% for the Company."[41] The special committee agreed, and instructed

---

[39] *Id.* at A93 (Am. Compl. ¶ 121).
[40] *Id.* at A94 (Am. Compl. ¶ 123).
[41] *Id.* at A95 (Am. Compl. ¶ 125).

17

Lodzinski "that the Committee would like to keep the Company's ownership percentage at approximately 40%."[42]

Six days later, on September 19, 2016, Lodzinski and Castillo discussed the transaction, and Lodzinski agreed to propose to the special committee a transaction that would result in Earthstone owning 39% of the combined entity. Lodzinski also told Castillo that he would request authority from the special committee to accept a transaction that left Earthstone with 38.7% of the combined entity. A few days later, Lodzinski took this proposal to the special committee. After "[a] very brief discussion (the entire meeting lasted only 26 minutes), . . . the Special Committee authorized Lodzinski to finalize the negotiations with Bold for" 38.7% of the combined entity.[43]

After this point, negotiations moved quite rapidly. On October 7, 2016, the special committee sent a draft Contribution Agreement to Bold.[44] Bold responded almost two weeks later.[45] During this time, Lodzinski met with Castillo and other members of Bold's management team to iron out "employee matters" and other transaction details. Negotiations were finalized during the last week of October and

---

[42] *Id.*
[43] *Id.* at A97 (Am. Compl. ¶ 128).
[44] App. to Opening Br. at A297 (Proxy Statement, at 52).
[45] *Id.*

the first week of November, when Earthstone and Bold negotiated the final Contribution Agreement.

On November 7, 2016, Earthstone and Bold reached an agreement on the structure and final economic terms of the transaction. Earthstone stockholders would end up owning approximately 39% of the combined company. The special committee met that day, received a fairness opinion from Stephens, and approved the transaction. Later that same day, Earthstone's full board met. After hearing the special committee's recommendation, the board approved the transaction. The board announced the transaction the next day. On May 9, 2017, Earthstone's disinterested stockholders approved the deal. "Of the voted shares not held by Oak Valley or the Company's executive officers, 99.7% voted in favor of the Transaction."[46]

## II.

The plaintiff filed his complaint for breach of fiduciary duties against the Earthstone directors, EnCap/Oak Valley as Earthstone's controlling stockholders, Lodzinski and Singleton as officers of Earthstone, and the Bold entities for aiding and abetting breaches of fiduciary duty. The Court of Chancery dismissed the complaint because (1) EnCap/Earthstone preconditioned the deal on *MFW*'s dual requirements up front in its August 19 Letter, (2) the special committee was well

---

[46] *Olenik*, 2018 WL 3493092, at *12.

functioning, and (3) the stockholder vote was informed and not coercive. According to the court, the plaintiff had not pled facts sufficient to overcome the business judgment standard of review requiring dismissal.

## A.

Our standard of review of a decision granting a motion to dismiss is *de novo*.[47] At the motion to dismiss stage, we must "accept as true all of the plaintiff's well-pleaded facts," and "draw all reasonable inferences" in plaintiff's favor.[48] Further, a motion to dismiss should be denied if the facts pled support a reasonable inference that the plaintiff can succeed on his claims.[49]

We address first the plaintiff's argument that the Court of Chancery erred when it found that *MFW*'s dual protections had been agreed to from the deal's inception. According to the plaintiff, although *MFW* requires that the dual protections be put in place "up front," the Court of Chancery failed to credit reasonable inferences from well-pled facts that the *MFW* procedural protections were not put in place until after almost eight months of substantive economic dealings among the parties. More specifically, the plaintiff claims that, based on the well-pled facts of the complaint, Lodzinski and EnCap substantially negotiated the

---

[47] *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 252 (Del. 2017).
[48] *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100 (Del. 2013).
[49] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536–37 (Del. 2011).

financial state of play between the companies before special committee involvement and the *MFW* conditions.

The defendants respond by pointing to the August 19 Letter from the special committee with the *MFW* conditions. According to the defendants, the interactions among Lodzinski, Earthstone, EnCap, and Bold that preceded the letter did not equate to substantive financial negotiations or "horse-trading" because "neither side changed its position on any issue" before the letter. Thus, under *MFW*, the complaint's allegations were insufficient to avoid a pleading-stage dismissal of the complaint.

B.

In *Kahn v. M&F Worldwide Corp.* we held that the business judgment standard of review governs mergers proposed by a controlling stockholder and its corporate subsidiary when conditioned from the beginning "upon the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority-of-the-minority of stockholders."[50] The most rigorous standard of review—entire fairness—was not needed to protect minority stockholders from overreaching because the controller "irrevocably and publicly disables itself from using its control to dictate the outcome of the

_____

[50] 88 A.3d 635, 644 (Del. 2014). Although the Earthstone/Bold transaction is not a transaction between the controlling stockholder and a controlled company, the same principles apply whether the controller is directly or indirectly exerting its influence over the transaction.

21

negotiations and the shareholder vote."[51]  With the controller's influence neutralized by the *MFW* conditions, the transaction takes on the "characteristics of third-party, arm's-length mergers, which are reviewed under the business judgment standard."[52]

Relying on the Court of Chancery's reasoning in *MFW*, we also explained that the *MFW* protections must be established "up front" if they are to serve as a "potent tool to extract good value for the minority."[53]  In other words, "from inception, the controlling stockholder knows that it cannot bypass the special committee's ability to say no," and "cannot dangle a majority-of-the-minority vote before the special committee late in the process as a deal-closer rather than having to make a price move."[54]  But, "if a plaintiff that can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist, that complaint would state a claim for relief that would entitle the plaintiff to proceed and conduct discovery."[55]

More recently, in *Flood v. Synutra*,[56] we considered in greater detail the "up front" requirement.  In *Synutra*, the controlling stockholder's first expression of interest was quickly followed by the *MFW* dual requirements before any substantive

---

[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.* at 645.
[56] 195 A.3d 754 (2018); *see also in re Books-A-Million, Inc. Stockholders Litig.*, 2016 WL 5874974, at *9 (Del. Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56 (Del. 2017) (finding a rejected offer made in 2012 without *MFW* conditions did not preclude *MFW* applying to a new 2015 offer).

negotiations took place between the controller and the special committee. Taking a pragmatic approach, we held in *Synutra* that the defendants satisfied the *MFW* requirements because the controller "condition[ed] its offer on the key protections at the germination stage of the Special Committee process, when it [was] selecting its advisors, establish[ed] its method of proceeding, beg[an] its due diligence, and ha[d] not commenced substantive economic negotiations with the controller."[57] We recognized, however, that "when a plaintiff has pled facts that support a reasonable inference that the two procedural protections were not put in place early and before substantive economic negotiation took place," the court should "refuse to dismiss the case."[58] That is, *MFW* is not satisfied if a controller has not "accept[ed] that no transaction goes forward without special committee and disinterested stockholder approval early in the process and before there has been any economic horse trading."[59]

The Court of Chancery held correctly that preliminary discussions between a controller's representatives and representatives of the controlled company do not pass the point of no return for invoking *MFW*'s protections. But, based on our

---

[57] *Synutra*, 195 A.3d at 765.

[58] *Id.* at 765. Here, the plaintiff also raised a technical argument—the offer with the *MFW* conditions did not come directly from the controller but instead from the special committee. Under the facts of this case, the distinction does not make a difference in our analysis. EnCap indirectly controlled Earthstone and appeared to agree with the special committee's insistence on the MFW conditions.

[59] *Id.* at 756.

review of the plaintiff's complaint, as informed by our *Synutra* decision, the well-pled facts "support a reasonable inference" that the *MFW* requirements "were not put in place early and before substantive economic negotiation took place."[60]

First, in April 2016 Lodzinski told the Earthstone board that he was "updating analysis" of Bold and intended to make "an offer."[61]  And, in his August 1, 2016 letter to the Earthstone board, Lodzinski said he was "negotiating"[62] with Bold while the special committee and its advisors were still "getting up to speed."[63]

Second, viewed along the negotiating continuum, the well pled facts show that substantial economic negotiations took place well before the August 19 Letter with the *MFW* conditions:

- During early discussions in November 2015, the controller, EnCap, provided Earthstone with a presentation that EnCap's investment bank, TPH, had used the previous summer to market the target company, Bold; Earthstone management and EnCap held a conference call to discuss a potential deal; and Earthstone and EnCap executed a confidentiality agreement governing the exchange of information about Bold.

- The next month, EnCap provided Earthstone with information about Bold, including access to a data room and confidential technical, operational, financial, and analytic information about Bold; Earthstone entered a confidentiality agreement with Bold; Earthstone management spoke with TPH; TPH provided a technical overview of Bold's assets to Earthstone and EnCap; and Earthstone, EnCap, and TPH met again to discuss Bold's assets.

---

[60] *Id.* at 764.

[61] App. to Opening Br. at A740 (Apr. 27, 2016 Letter from Lodzinski to Earthstone Board of Directors, at 7).

[62] *Id.* at A1050 (August 1, 2016 Letter from Lodzinski to the Earthstone Board, at 3).

[63] *Id.* at A88 (Am. Compl. ¶ 110) (quoting Minutes of a Meeting of the Special Committee, Aug. 3, 2016).

- During that same month, Earthstone management met with three separate investment banks to get their views on valuation parameters related to Bold's assets, methods to fund their development, and equity market receptivity to a possible deal with Bold.

- In April 2016, when Lodzinski decided to restart negotiations as the oil and gas market began recovering, Earthstone management met with EnCap to discuss moving forward on the Bold deal.

- Presentation materials from the Earthstone board's May 3, 2016 meeting indicated an "Active" potential deal where Bold was listed as the "Seller" and EnCap as a "Financial Partner."[64]

- In May 2016, there were multiple substantive economic communications between Earthstone and EnCap. Earthstone management delivered a presentation to EnCap about the proposed deal indicating an equity valuation for Bold of approximately $305 million, which EnCap said it would review with TPH. Then, about a week later, Earthstone management made another presentation to EnCap about the transaction, this time raising its valuation of Bold to about $335 million. Several days after that second presentation, Earthstone communicated with EnCap and TPH again about the transaction and gave TPH access to Earthstone's data room, which included Earthstone's combined corporate model of the two companies as well as a model of Earthstone's net asset valuation.

- In June and July 2016, there were numerous meetings between various representatives of Earthstone, EnCap, Bold, and TPH, including meaningful on-site due diligence regarding Bold's assets in West Texas.

While some of the early interactions between Earthstone and EnCap could be fairly described as preliminary discussions outside of *MFW*'s "from the beginning" requirement, the well-pled facts in the complaint support a pleading stage inference that the preliminary discussions transitioned to substantive economic negotiations

---

[64] App. to Opening Br. at AA74 (Am. Compl. ¶ 83).

when the parties engaged in a joint exercise to value Earthstone and Bold. In the presentations made by Earthstone to EnCap, Earthstone management valued Bold at $305 million in the first presentation and $335 million in the second presentation. Based on these facts, it is reasonable to infer that these valuations set the field of play for the economic negotiations to come by fixing the range in which offers and counteroffers might be made.[65] According to the complaint, that generally turned out to be the case. Earthstone's first formal offer—the one in which the *MFW* conditions were finally mentioned—reflected an equity valuation for Bold of about $300 million, and the final deal reflected an equity valuation for Bold of around $333 million.[66] Additionally, at the August 10 board meeting management presented a transaction with an already presumed timeline (to be announced in "Q3/Q4" of that year) and an "assumed" price of $333 million.[67]

In *Synutra* we described the ordinary meaning of "from the beginning" as the first stage of an ongoing process.[68] According to the complaint's well-pled allegations, EnCap, Earthstone, and Bold were engaged in substantive economic discussions during some of the eight months before the *MFW* protections were put

---

[65] *See generally* Amos Tversky & Daniel Kahneman, *Judgment Under Uncertainty: Heuristics and Biases*, 185 SCIENCE 1124, 1128–30 (1974) (coining the term "anchoring" to describe the phenomenon in which a starting value biases future adjustments toward that initial value).

[66] If a 55/45 split in Bold's favor implies a $300 million equity valuation for Bold, then the final 61/49 split implies a $333 million equity valuation for Bold.

[67] *Id.* at A1059, 1077 (August 10, 2016 Earthstone Board Meeting, at 6, 24).

[68] *Synutra*, 195 A.3d at 761–62.

place. Where, as here, the plaintiff "has pled facts that support a reasonable inference that the two procedural protections were not put in place early and before substantive economic negotiation took place," the plaintiff has met his pleading-stage burden and the complaint should not have been dismissed on *MFW* grounds.[69]

C.

The defendants ask us to affirm the Court of Chancery's decision on an alternative ground not considered by the court—that EnCap shed its controller status before the Earthstone special committee's August 19 Letter containing the *MFW* conditions. Until mid-June 2016, EnCap owned a majority of Oak Valley's units, which in turn owned a majority of Earthstone stock. After the 2016 reverse merger involving Earthstone and Oak Valley, Oak Valley's ownership interest in Earthstone dropped to about forty percent. The defendants rely on the drop below majority ownership before the August 19 Letter as dispositive of the control issue.

We agree with the defendants that a controlling stockholder must own a majority of a corporation's voting power or have "effective control of the board" and exercise control over the corporation's conduct.[70] And, we agree that around mid-June, 2016, EnCap through Oak Valley no longer held a majority of Earthstone's

---

[69] *Id*. at 764.

[70] *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 307 (Del. 2015); *see also Weinstein Enterprises, Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005) ("[T]he plaintiff must establish the actual exercise of control over the corporation's conduct by that otherwise minority stockholder.").

stock. But, the plaintiff has pled facts that support a claim that EnCap controlled Earthstone after the 2016 reverse merger and also held a majority of Earthstone's stock while substantive economic negotiations took place that fixed the field of play for the eventual transaction price.

First, in Earthstone's March 2017 10-K—issued after the August 19 Letter with the *MFW* conditions—Earthstone described itself as a "company with a controlling shareholder."[71] Further, the plaintiff has pled that EnCap, through Lodzinski, led the negotiations for the transaction.[72] According to the complaint, Lodzinski was a conflicted negotiator because of his long-term relationship with EnCap. And, according to the complaint, Lodzinski negotiated his continued employment with Earthstone before Earthstone formally created the special committee.[73]

Further, as pled in the complaint, key substantive economic negotiations occurred before the August 19 Letter when it is undisputed that EnCap controlled Oak Valley and Earthstone. The two valuations of Bold proposed by Lodzinski occurred in May, 2016. And there were multiple other meetings, confidentiality

---

[71] App. to Opening Br. at A642 (March 17, 2017 Earthstone Annual Report (Form 10-k), at 28). Additionally, the inclusion of the *MFW* conditions in August continue to suggest that Earthstone viewed EnCap as its controlling shareholder.

[72] *See In re Crimson Expl. Inc. Stockholder Litig.*, 2014 WL 5449419, at *16 (Del. Ch. Oct. 24, 2014) (requiring a plaintiff to show that the stockholder "actually controlled the board's decision *about the transaction at issue*") (emphasis added).

[73] App. to Opening Br. at A44 (Am. Compl. ¶ 12).

agreements, due diligence, and logistical discussions while EnCap was a majority stockholder. Thus, the defendants are not entitled to a pleading stage dismissal based on lack of control because the facts pled support the reasonable inference that EnCap acted as Earthstone's controlling stockholder while key economic negotiations took place between Earthstone and Bold which set the financial playing field for later negotiations.[74]

## D.

Finally, we turn to the plaintiff's disclosure claims. On appeal, the plaintiff claims the Court of Chancery erred in dismissing the disclosure claims because the proxy statement failed to disclose that (1) Stephens's initial contribution analysis did not support a 40/60 Earthstone/Bold split for the transaction; (2) Stephens was

---

[74] The defendants also raise two other arguments. First, they claim that the plaintiff failed to plead facts that the transaction was not entirely fair. To survive a motion to dismiss in an entire fairness case, the plaintiff must plead facts that, with all reasonable inferences drawn in their favor, show the transaction was unfair. *Soloman v. Pathe Commc'ns Corp.*, 672 A.2d 35, at 38 (Del. 1996); *See also Calma v. Templeton*, 114 A.3d 563, 589 (Del. Ch. 2015) (quoting *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995)) (requiring "some facts that tend to show that the transaction was not fair."). Here, the plaintiff has met his burden. The plaintiff has pled that Bold's cash position required EnCap to sell Bold; Earthstone's financial advisor at one time proposed a ratio with Earthstone acquiring 60% of the combined entity; and Lodzinski, as a conflicted negotiator due to his ties with EnCap, assumed what should have been the special committee's lead role in the financial negotiations. App. to Opening Br. at A41, 44-45, 89 (Am. Compl. ¶¶ 5, 12, 113). Defendants Lodzinski and Singleton also claim that the plaintiff has not pled non-exculpated claims against them. *See* 8 *Del. C.* § 102(b)(7). We agree with the plaintiff, however, that the complaint has pled non-exculpated claims. The plaintiff pled both breach of loyalty claims and claims against them as corporate officers, neither of which are subject to exculpation under 8 *Del. C.* § 102.

29

pressured to revise its analysis, which helped support the final split; and (3) EnCap was motivated to sell Bold due to its cash position.

Directors "have a fiduciary duty to disclose fully and fairly all material information within the board's control that would have a significant effect upon a stockholder vote when it seeks or recommends a shareholder action."[75] Omitted information is material "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[76] To be material the missing information does not have to cause a reasonable shareholder to change her vote.[77]

We agree with the Court of Chancery that the plaintiff failed to state a disclosure claim. Although the proxy does not discuss the changes in Stephens's analysis, it does include projections for each of the years 2017-19. Stephens emphasized that it "did not regard the relative contribution metrics as meaningful" given the "difference in development stages" of the two companies.[78] From those yearly projections it is apparent that the contribution analysis favors Earthstone in

---

[75] *Appel v. Berkman*, 180 A.3d 1055, 1060 (Del. 2018).

[76] *Morrison v. Berry*, 191 A.3d 268, 283 (Del. 2018) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[77] *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 859 (Del. 2015) (quoting *Rosenblatt*, 493 A.2d at 944).

[78] App. to Opening Br. at A31. *See Olenik*, 2018 WL 3493092, at \*22 (the proxy "made clear that, in Stephens' opinion, the growth dynamic between the two companies diminished the relevance of the contribution analysis as an indicator of value.").

the early years and Bold in the later years. Investors were free to place the emphasis where warranted. Although the plaintiff alleges that Stephens should have disclosed that it was allegedly pressured to change its analysis, the defendants do not have to adopt "plaintiff's characterization of the facts."[79] And finally, as for EnCap's reason for selling Bold—that "Bold [was] in dire need of cash and EnCap [was] on the hook for further capital infusions"[80]—the reason was apparent on the face of the proxy.[81] The proxy disclosed Bold's financials. They showed that Bold was in a poor cash position. As the Court of Chancery held, "the Board was not obliged to characterize Bold's cash position, particularly when the facts were disclosed and neither the Special Committee nor the Board actually concluded that Bold was distressed and needed to sell."[82]

---

[79] *Shaev v. Adkerson*, 2015 WL 5882942, at *10 (Del. Ch. Oct. 5, 2015) (quoting *Seibert v. Harper & Ros, Publishers, Inc.*, 1984 WL 21874, at *6 (Del. Ch. Dec. 5, 1984); *see also Frank v. Arnelle*, 725 A.2d 441, 1999 WL 89284, at *2 (Del. Jan. 22, 1999) (no requirement to disclose "soft information" of a financial advisor's opinion on value); *Brody v. Zaucha*, 697 A.2d 749, 754 (Del. 1997) (not requiring a director to adopt "his opponents' current explanation of why he was removed").

[80] Opening Br. at 46.

[81] App. to Opening Br. at A263, A341-49 (Proxy Statement, at 19, 94-101) (disclosing Bold's financial position and noting that its "primary sources of liquidity . . . has been equity investments from EnCap and Bold's management and employees").

[82] *Olenik*, 2018 WL 3493092, at *23.

31

## III.

The Court of Chancery's decision dismissing the complaint is affirmed in part and reversed in part. The case is remanded for proceedings consistent with this opinion. Jurisdiction is not retained.