# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LANCE SALLADAY, On Behalf of Himself and All Other Similarly Situated Former Stockholders of INTERSECTIONS, INC., | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2019-0048-SG |
| BRUCE L. LEV, DAVID A. MCGOUGH, and MICHAEL R. STANFIELD, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: November 19, 2019
Date Decided: February 27, 2020

Peter B. Andrews, Craig J. Springer, and David M. Sborz, of ANDREWS AND SPRINGER LLC, Wilmington, Delaware; OF COUNSEL: Jeremy S. Friedman and David F.E. Tejtel, of FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York, *Attorneys for Plaintiff.*

D. McKinley Measley and Elliott Covert, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Charles C. Platt and Andrew Sokol, of WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, *Attorneys for Defendants.*

GLASSCOCK, Vice Chancellor

It is axiomatic that transactions in which a majority of the board stands on both sides of a deal raise questions of whether the directors have acted in their own, and not the corporate, interest; and that in such situations, the presumption of business judgement is overcome and the burden shifts to the conflicted fiduciaries to show that the transaction is entirely fair. It is nearly as axiomatic that, where entire fairness is the standard of review, a motion to dismiss is rarely granted, because review under entire fairness requires a record to be meaningful. Such a case is before me now, on a motion to dismiss.

It is likewise true, however, that value to the entity or its stockholders can inhere in a conflicted transaction, and that allowing conflicted boards to replicate the value-enhancing structure of an arms-length transaction and thereby re-invoke the business judgment rule allows value-maximizing transactions to go forward where they might otherwise be eschewed in light of the onerous entire fairness standard. Our courts have recognized two methods (absent a controlling stockholder) for boards to revive business judgment review for such a transaction: by making the transaction subject to the informed, un-coerced vote of the majority of shares held by those free of conflict (under *Corwin*[1]); or by permitting an unconflicted

---

[1] *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).

committee of the board full scope to negotiate and enter any transaction (as proposed in *Trados II*[2]).  Here, according to the Defendant directors, the board did both.

Upon examination of this pleading-stage record, however, and in light of the plaintiff-friendly standard I must employ, I find that entire fairness remains the standard of review.  I find that the special committee of unconflicted directors entered the negotiations after the point at which it could act to replicate an arms-length transaction, and that the disclosures to the stockholders in way of the vote were inadequate to invoke business judgement review.  For those reasons, the Defendants' Motion to Dismiss is denied.  My reasoning is below.

## I. BACKGROUND[3]

*A. The Parties*

Non-party Intersections, Inc. ("Intersections" or the "Company") is a Delaware corporation headquartered in Virginia.[4]  It provides identity protection

---

[2] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013).

[3] I draw all facts from the Plaintiff's Verified Amended Class Action Complaint, D.I. 21 ("Am. Compl.") and documents incorporated therein.  *See in re Morton's Rest. Grp., Inc. S'holder Litig.*, 74 A.3d 656, 658–59 (Del. Ch. 2013) (permitting consideration of documents incorporated into complaint in motion to dismiss); *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *3 (Del. Ch. Aug. 18, 2017) (same).  As discussed further below, all well-pled facts are considered true for the sake of this motion.

[4] Am. Compl. ¶ 15.

software services that help protect sensitive information and data in the virtual world.[5] Until the going-private transaction, it traded publicly on the NASDAQ.[6]

Plaintiff Lance Salladay was a stockholder of Intersections at all relevant times.[7]

Non-party Loeb Holding Corporation ("Loeb") is a Delaware corporation and private equity firm.[8] It co-founded Intersections in 1996, and it was the Company's largest pre-merger stockholder.[9] As of November 15, 2018, Loeb beneficially owned approximately 42.7% of Intersections' outstanding common stock.[10]

Defendant Bruce Lev was a director of Intersections since November 2014.[11] He has served as the managing director at Loeb since 2003.[12]

Defendant David McGough was a director on the Intersections board (the "Board") since August 1999.[13] As of November 15, 2018, McGough beneficially owned approximately 4.7% of Intersections' outstanding common stock.[14]

---

[5] *Id.*

[6] *Id.*

[7] *Id.* ¶ 10.

[8] *Id.* ¶¶ 2, 19.

[9] *Id.*

[10] *Id.* ¶ 11 n.2.

[11] *Id.* ¶ 11.

[12] *Id.*

[13] *Id.* ¶ 12.

[14] *Id.* ¶ 12 n.3.

McGough also founded and serves as CEO of Digital Matrix Solutions ("DMS"), a private company that has partnered with Intersections over the course of multiple decades.[15]

Defendant Michael Stanfield served as Chairman of the Intersections Board since May 1996.[16] Stanfield co-founded CreditComm Services LLC ("CreditComm"), Intersections' predecessor, with Loeb.[17] From May 1996 until January 2017, Stanfield served as CEO of Intersections.[18] He was reappointed as CEO in January 2018.[19] As of April 1, 2018, Stanfield beneficially owned approximately 8.7% of Intersections' outstanding common stock.[20]

Non-parties John M. Albertine, Thomas G. Amato, and Melvin R. Seiler were directors at Intersections.[21]

Non-party iSubscribed Inc. ("iSubscribed") is a Delaware corporation focused on consumer digital security.[22] Non-parties WndrCo Holdings LLC, General Catalyst Group IX, L.P., GC Entrepreneurs Fund IX, L.P., and iSubscribed

---

[15] *Id.* ¶¶ 2, 12.

[16] *Id.* ¶ 13.

[17] *Id.*

[18] *Id.* Prior to joining CreditComm/Intersections as CEO, Stanfield worked as Managing Director at Loeb Partners Corporation, an affiliate of Loeb. *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* ¶¶ 16–18.

[22] *Id.* ¶ 20.

(collectively the "iSubscribed Investment Group") together formed a joint venture, WC SACD, a Delaware corporation, for the purpose of purchasing Intersections.[23]

*B. Factual Background*

### 1. Intersections Struggles Financially While It Develops Its Flagship Product, Identify Guard® with Watson™[24]

Intersections provides credit management and identity theft protection services to North American subscribers.[25] Its "flagship product," Identity Guard, accounts for around 95% of its revenue.[26] As of 2018, the Company had over 1.1 million subscribers.[27] Originally founded as CreditComm in 1996, Intersections went public in 2004, and since then the Defendants Stanfield, McGough, and Lev (through his control of non-party Loeb) have collectively owned a stake that the Company's SEC filings recognize as potentially controlling.[28]

---

[23] *Id.* ¶ 21.

[24] The Amended Complaint consistently refers to the product throughout as Identify Guard® with Watson™. I include this footnote not only to demonstrate the dexterity of an aged jurist in the insertion of superscriptic symbols into documents (thank you, law clerks), but also to acknowledge the trademarks in the product's name. However, for simplicity's sake, I discard the symbols for the remainder of this Memorandum Opinion.

[25] Am. Compl. ¶ 22.

[26] *See id.*

[27] *Id.*

[28] *Id.* ¶¶ 23–27. Intersections' 2018 10-K notes that "[i]nsiders have substantial control over us and could delay or prevent a change in corporate control, which may harm the market price of our common stock." *Id.* ¶ 27. The 10-K notes that Loeb owned, at the time of the 10-K, 40% of the stock, and that Loeb in turn was controlled by an Intersections Director [i.e. Lev]. *Id.* the 10-K acknowledged that Stanfield and McGough also owned significant stakes. *Id.* "If these stockholders act together, they could have the ability to significantly influence or control the

In 2017, Intersections launched an upgraded version of its flagship product: Identity Guard with Watson.[29] This updated software used artificial intelligence (AI) to, theoretically, improve protection and enhance nearly every feature of the product.[30] Because such use of AI was unprecedented in its market, Intersections' former CEO, Johan Roets, predicted that a successful launch had the potential to swell Intersections' subscriber base nearly a hundred-fold, up to 100 million users.[31] The launch, however, largely failed.[32] Intersections went back to the drawing board to recalibrate the product, and it forecast a release date for an upgraded version in December 2018, which was then delayed to the first quarter of 2019.[33] Intersections continued to make significant investments in anticipation that Identity Guard with Watson not only had growth potential, but that it represented the future of the Company.[34]

---

management and affairs of our company and potentially determine the outcome of matters submitted to our stockholders for approval." *Id.*

[29] *Id.* ¶¶ 30, 33.

[30] *Id.* ¶¶ 30–31.

[31] *Id.* ¶ 32.

[32] *Id.* ¶ 33.

[33] *Id.* ¶¶ 34, 37.

[34] *Id.* ¶¶ 33, 35, 37–38. An advisor to the Special Committee corroborated this growth potential, noting that Internet fraud was on the rise, while revenue for identity theft protection services remained flat, so market demand was certain to increase. *Id.* ¶ 36. The advisor predicted that "after its full launch in 2019, Identity Guard with Watson would rapidly account for the vast majority of the Company's subscribers." *Id.* ¶ 38.

While Intersections was working to get its upgraded product on the market, it was also experiencing financial difficulties.[35] It limited cash spending early in 2017, and in late 2017 amended its credit agreement with PEAK6 Investments, L.P. (PEAK6") to increase borrowing.[36] Early in 2018, the Company began to look for additional borrowing or stock equity sales to raise capital.[37] Several parties expressed interest, and the Company formed a special committee (the "Committee"), consisting of three independent directors, to enter due diligence and explore possible financing options with the potential partners.[38] The Committee retained Houlihan Lokey, Inc. ("Houlihan Lokey") as its financial advisor to evaluate potential financing transactions.[39] In addition, Intersections gave promissory notes to Loeb and McGough in return for $2 million and $1 million respectively to help pay down its balance under its credit agreement with PEAK6.[40]

---

[35] *Id.* ¶ 39.

[36] *Id.*

[37] *Id.* ¶¶ 40–41.

[38] *Id.* ¶¶ 41–47. In March, the Company agreed to a non-binding term sheet with Hale Capital Partners to obtain $25 million in financing, but the parties were unable to finalize the deal. *Id.* ¶ 41. In June, it received a non-binding term sheet from NewSpring Capital ("NewSpring") for $30 million in financing. *Id.* ¶ 42. Also in June, private equity firm KKR & Co. Inc. ("KKR") submitted an unsolicited non-binding proposal to acquire Intersections for $3.31 per share. *Id.* ¶ 43. KKR eventually dropped out. *Id.* ¶ 46. NewSpring partnered with other investment funds to explore financing, and these explorations continued into 2018. *Id.* ¶ 47.

[39] *Id.* ¶ 45.

[40] *Id.* ¶ 44. Later, on September 28, 2018, the Company would borrow another $1 million from Loeb through a bridge note. *Id.* ¶ 54.

## 2. WC SACD Discusses a Potential Transaction with Intersections and the Defendants

In September 2018, a new player entered the field. On September 14, a representative of the iSubscribed Investor Group contacted Intersections to explore a potential transaction, and Stanfield, Lev, and Intersections' CFO met with iSubscribed Investor Group representatives.[41] iSubscribed simultaneously reached out to Loeb about its interest in the Company.[42] Within a week, iSubscribed entered a non-disclosure agreement and began conducting due diligence.[43] On September 25, an iSubscribed Investor Group representative contacted Lev to discuss its interest in acquiring Intersections.[44] The iSubscribed Investor Group then formed WC SACD for the purpose of an acquisition.[45]

On September 27, a WC SACD representative met with Intersections' Chairman of the Board and CEO Stanfield.[46] At that meeting, Stanfield "effectively told WC SACD that the Intersections Board would be receptive to an acquisition offer of $3.50 to $4.00 per share."[47] On October 5, the Board met with management

---

[41] *Id.* ¶¶ 48–49.

[42] *Id.* ¶ 48.

[43] *Id.* ¶ 50.

[44] *Id.* ¶ 51.

[45] *Id.* ¶ 52.

[46] *Id.* ¶ 53.

[47] *Id.* The Amended Complaint notes that Stanfield did not have authority to negotiate on behalf of the Company. *Id.*

and discussed the Company's financial needs, reviewed its status with potential financers, and reconstituted the Committee, which had been previously abandoned.[48] According to the Proxy, before the Board considered WC SACD's first offer, it decided it would not approve any transaction not supported by the Committee.[49] Prior to this meeting, Defendant directors Stanfield, Lev (on behalf of Loeb) and McGough had all expressed a desire[50] to roll over "the substantial majority" of their Intersections stock in a going-private transaction with WC SACD.[51]

On October 9, WC SACD proposed to acquire Intersections at $3.50 per share (the "Merger") and provide $30 million of senior secured convertible note financing (the "Note Purchase Agreement," and together with the Merger the "Transaction").[52] Notably, the $3.50 per share offer was at the precise bottom of the range Stanfield had suggested to WC SACD representatives.[53] The Transaction also contemplated that Stanfield, McGough, and Loeb could roll their equity into the deal.[54] Loeb and

---

[48] *Id.* ¶ 55.

[49] Transmittal Aff. of Elliot Covert in Support of Defs. Bruce L. Lev, David A. McGough and Michael R. Stanfield's Opening Br. in Support of their Mot. to Dismiss the Am. Compl. ("Covert Aff."), Ex. A, Schedule 14D-9 ("14D-9" or the "Proxy"), at 17.

[50] The lack of an indirect object in this sentence is an artifact of the Complaint, which does not identify to whom this desire was "expressed."

[51] *Id.*

[52] *Id.* ¶ 56. The senior convertible notes would be convertible into Intersections common stock at $2.27 per share. *Id.*

[53] *Compare id.* ¶ 53 (Stanfield suggesting Board would be agreeable to offer of $3.50 to $4.00 per share) *with id.* ¶ 56 (WC SACD's making initial offer of $3.50 per share).

[54] *Id.* ¶ 57.

9

McGough would exchange their existing promissory notes for convertible note financing, at a favorable rate.[55] Finally, the offer was contingent on the Company granting WC SACD "the right to designate a majority of the members on the Board of Directors if the proposed acquisition transaction were terminated . . . ."[56] The Committee renegotiated WC SACD's designation right so that while it applied if the Merger failed, it did not apply if that failure was due to WC SACD's breach or abandonment.[57]

### 3. The Committee Negotiates a Deal with WC SACD

On October 10, the Committee met to discuss the proposal and engaged legal counsel.[58] It determined that any acquisition would be conditioned on approval by a majority-of-the-minority stockholder vote.[59] Negotiations continued on October 11, when WC SACD increased its offer to $3.68 per share.[60] The Committee then recommended that the Board enter an exclusivity agreement with WC SACD, which

---

[55] *Id.* Like WC SACD's notes, these would be convertible into Intersections common stock at $2.27 per share. *Id.*

[56] *Id.*; 14D-9, at 18.

[57] *See* 14D-9, at 10, 25.

[58] Am. Compl. ¶ 58.

[59] *Id.* ¶ 58. In other words, a majority approval by those stockholders not rolling over their shares in the transaction. *Id.*

[60] *Id.* ¶ 59.

the Board did.[61]  At that point, the Committee authorized its counsel to "commence negotiation of the definitive merger and note financing documentation."[62]

At the October 11 meeting, the Committee retained a "nationally recognized investment banking firm" as financial advisor for the proposed transaction, the price term of which was already in place.[63]  According to the Amended Complaint, "just days after its retention, the investment banking firm abruptly terminated the engagement."[64]  Following a brief search, the Committee retained North Point Advisors ("North Point"), giving it eight days to review the proposed transaction and provide a fairness opinion while the Committee continued to negotiate and review details.[65]

Intersections' exclusivity agreement with WC SACD lasted through November 9, 2018, but WC SACD allowed the Company to continue discussions with potential partners with whom it had already engaged.[66]  While negotiations were ongoing with WC SACD, two of those potential financing partners submitted proposals offering financing in a mix of debt, convertible notes, and equity.[67]  Over

---

[61] *Id.* ¶¶ 59–60.

[62] *Id.* ¶ 59.

[63] *Id.* ¶ 63.

[64] *Id.*

[65] *Id.* ¶¶ 64–65.

[66] *Id.* ¶ 60.

[67] *Id.* ¶ 61.

the next two weeks, while working on the Transaction with WC SACD, the Committee conducted one phone call with each of the two potential financing partners and did not make any counter-proposals or engage in further negotiations.[68]

On October 29, the Committee met a final time, and North Point provided its fairness opinion on the Transaction (the "Fairness Opinion").[69] The Amended Complaint alleges the Fairness Opinion was based on misleading information from both management and the Committee.[70] The Committee recommended approval of all aspects of the Transaction.[71] Later that day, the Board met, adopted the Committee's recommendation, and approved the Transaction at $3.68 per share, just below the midpoint of the range suggested to WC SACD by Stanfield.[72] After it

---

[68] *Id.* ¶ 62.

[69] *Id.* ¶ 66.

[70] *Id.* ¶¶ 80–89. Intersections' management created a base case scenario ("Base Case") and an upside case scenario ("Upside Case") for the Committee. *Id.* ¶ 82. The Base Case projected 2018 performance below where the Company was actually performing year-to-date. *Id.* Despite the fact that the Company did not expect a regression in performance, the Base Case projected declining EBITDA in 2019 and 2020. *Id.* The Upside Case, by contrast, reflected improved Company performance based on the re-release of Identity Guard with Watson, a return to direct-to-consumer marketing, and additional capital infusions. *Id.* ¶¶ 83, 85–86. The Committee determined the Base Case was the appropriate scenario, and according to the Amended Complaint, "it appears that the Committee did not even provide the Upside Case projections to North Point." *Id.* ¶ 83 (citing 14D-9, at 36). North Point's Discounted Cash Flow ("DCF") analysis, when run on the Upside Case, produces a share value range of $11.49 to $22.81 per share. *Id.* ¶ 87. North Point also conducted a Comparable Public Trading Multiple Analysis as well as a Comparable Precedent Transaction Analysis, both of which yielded a per share price over $7.00. *Id.* ¶ 88. The fairness opinion does not mention the Upside Case.

[71] *Id.* ¶ 66.

[72] *Id.* ¶ 67; *see also id.* ¶ 53 (Stanfield proposing offer range of $3.50 to $4.00 per share).

12

approved the Transaction, Intersections informed the potential financing partners who had submitted proposals that it was not interested in proceeding with them.[73]

### 4. Intersections Enters the Merger Agreement and the Note Purchase Agreement

On October 31, 2018, WC SACD and Intersections entered two agreements: the Merger, and the Note Purchase Agreement.[74] Under the Note Purchase Agreement, the Company issued senior secured convertible notes ("Notes") in the principal amount of $30 million to WC SACD, a Note in the amount of $3 million to Loeb, and a Note in the amount of $1 million to McGough.[75] The Notes were convertible into common stock at a price of $2.27 per share.[76] Additionally, Stanfield, Loeb, and McGough entered into support agreements to tender their shares and grant proxies to vote their shares in favor of the Merger.[77] Intersections issued

---

[73] *Id.* ¶¶ 62, 68.

[74] *Id.* ¶ 69. The Note Purchase Agreement was conditioned on the signing of the Merger Agreement as well as approval by a majority of Intersections stockholders. *Id.* Intersections obtained this majority approval through the written consent of Stanfield's, Loeb's, and McGough's shares. *Id.*

[75] *Id.* ¶ 70. The Amended Complaint details the terms of the Notes: 6% annual interest for 12 months after the Merger and 8% thereafter; 36 month maturation date after the Merger; first-priority security interest of all Intersections assets; guaranteed by Intersections' subsidiaries; automatic conversion into Intersections common stock immediately prior to the Merger's consummation. *Id.* ¶¶ 71–72. Loeb converted into 1,324,009 shares of common stock, and McGough converted into 441,337 shares of common stock upon closing. *Id.* ¶ 72. As the Plaintiff notes, this conversion allowed Loeb and McGough to purchase into the new company at $2.27 per share, a price significantly below the sale price. *Id.* ¶ 79.

[76] *Id.* ¶¶ 74–75.

[77] *Id.* ¶ 73.

13

a press release announcing the Merger.[78]  In addition to explaining the Merger, the press release also described the Note Purchase Agreement, the conversion price of $2.27 per share, and the use of the funds to repay PEAK6 liabilities.[79]

In connection with the Merger, each of the Defendants rolled over significant portions of their equity.[80]  Loeb rolled over 80% of its shares, McGough rolled over 68.6% of his shares, and Stanfield rolled over 35.7% of his shares.[81]  Other benefits also resulted.  Stanfield received a golden parachute (i.e. change-in-control) payment of around $5.85 million and an 18-month consultation agreement with WC SACD worth $500,000 in cash as well as a stock option equity grant to acquire 839,178 shares of WC SACD common stock.[82]

### 5. Intersections Issues its 14D-9

On November 29, 2018, Intersections filed its Schedule 14D-9 ("14D-9" or the "Proxy") with the Securities and Exchange Commission.[83]  The Plaintiff, in his Amended Complaint, highlights four parts of the 14D-9 he considers materially deficient or misleading.

---

[78] *Id.* ¶ 74.

[79] *Id.* ¶¶ 74–75.

[80] *Id.* ¶ 76.

[81] *Id.*

[82] *Id.* ¶ 78.

[83] *Id.* ¶ 94.

*First*, in addition to describing the Merger, the 14D-9 detailed the Note Purchase Agreement entered into with WC SACD, Loeb, and McGough.[84] The 14D-9 describes, among other things, the aspect of the Note Purchase Agreement that would potentially give WC SACD control of the Board in case the Merger was voted down:

> If there is a termination of the Merger Agreement (other than a termination of the Merger Agreement by the Company due to a breach by Parent) and Parent owns at least 80% of its initial principal amount of Notes (or shares issued upon conversion thereof), and so long as any Notes (or Preferred Stock issued upon conversion of Notes) remain outstanding or any Significant Investor (as defined in the Note Purchase Agreement) owns Common Stock comprising at least 50% of the shares issued upon conversion of its Notes, subject to NASDAQ listing requirements (including NASDAQ Listing Rule 5640), a majority of the Company Board will resign and Parent will have the right to designate directors to fill such vacancies (provided that one director so designated shall be an independent director designated by Loeb Holding Corporation) and to appoint the Chief Executive Officer of the Company.[85]

In describing the factors the Committee considered in determining whether to recommend the Merger, the 14D-9 addressed the same feature of the Note Purchase Agreement a second time:

> The Special Committee . . . also considered the following countervailing factors: . . . the fact that the Note Purchase Agreement provides that, unless Purchaser elects in writing not to pursue the Offer or Merger described in the Merger Agreement for any reason, in the event the Merger Agreement is terminated, other than by reason of a

---

[84] *Id.* ¶¶ 90–91.

[85] *Id.* ¶ 91; 14D-9, at 10.

15

breach of such agreement by Purchaser, Purchaser has the right, subject to NASDAQ listing requirements and Commission rules, to designate a majority of the members of the Board of Directors and appoint the chief executive officer of the Company[.][86]

According to the Amended Complaint, WC SACD would have approximately a 35% ownership position in Intersections following the conversion of its Notes.[87] Therefore, NASDAQ Rule 5640, which proscribes appointment powers disproportionate to ownership, would potentially limit it to appointing only a minority of the Board.[88] However, the 14D-9 did not expressly disclose WC SACD's aggregate ownership percentage following the conversion of its Notes, nor explain how NASDAQ Rule 5640 would apply to the Note Purchase Agreement.[89]

*Second*, the 14D-9 did not disclose the reason why the first investment bank retained by the Committee on October 15 terminated its engagement several days later.[90]

*Third*, the 14D-9 did not disclose when WC SACD first discussed with Stanfield, Loeb, and McGough the opportunity to enter into the rollover, note

---

[86] Am. Compl., ¶ 91 n.36; 14D-9, at 25.

[87] Am. Compl., ¶ 95.

[88] *Id.* ¶¶ 95–96. As the Amended Complaint describes, and as I discuss further below, the effect of NASDAQ Rule 5640's application to the Transaction here remains in dispute. *Id.* ¶ 95 n.38.

[89] *Id.* ¶ 92 n.37. Additionally, a December 2018 Information Statement related to approval of the Note Purchase Agreement, filed with the SEC as a part of the Tender Offer, noted that the support agreements signed by Stanfield, Loeb, and McGough meant that "WC SACD beneficially owned an aggregate of 62.4% [of] Intersections common stock." *Id.* ¶ 97.

[90] *Id.* ¶ 98.

conversion, or consulting agreements that they eventually entered into in connection with the transaction.[91]

*Fourth*, the 14D-9 did not disclose the reason the Committee did not reengage Houlihan Lokey in October 2018, although it had engaged the firm just months before in connection with reviewing offers from potential financial partners.[92]  In addition, the 14D-9 did not disclose a summary of the financial analysis previously prepared by Houlihan Lokey for the Committee in connection with the earlier offers.[93]

### C. Procedural History

The Plaintiff filed his Complaint on January 22, 2019, originally against all six members of Intersections' Board.[94]  All Defendants moved to dismiss the Complaint on April 25.[95]  The Plaintiff voluntarily dismissed the claims against directors Albertine, Amato, and Seiler and filed an Amended Complaint on June 14.[96]  The Defendants renewed their Motion to Dismiss on July 24.[97]  I heard

---

[91] *Id.* ¶ 99.

[92] *Id.* ¶ 100.

[93] *Id.*

[94] Verified Class Action Compl. for Breach of Fiduciary Duties, D.I. 1.

[95] Defs. Bruce L. Lev, David A. McGough and Michael R. Stanfield's Mot. to Dismiss Pl.'s Verified Class Action Compl., D.I. 10; Defs. John M. Albertine, Thomas G. Amato, and Melvin R. Seiler's Mot. to Dismiss, D.I. 14.

[96] Stip. & Order of Voluntary Dismissal of Defs. John M. Albertine, Thomas G. Amato, and Melvin R. Seiler, D.I. 18; Am. Compl.

[97] Defs.' Mot. to Dismiss Pl.'s Am. Verified Class Action Compl., D.I. 25.

argument on the Defendants' motion on November 19 and considered the matter fully submitted at that time.

## II. ANALYSIS

*A. Legal Standards*

The Defendants have moved to dismiss this action under Chancery Court Rule 12(b)(6). In considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[98]

However, I do not need to accept "conclusory allegations unsupported by specific fact" as true, nor must I "draw unreasonable inferences" in the Plaintiff's favor.[99] I may consider facts in documents incorporated into the Amended Complaint.[100]

Under Delaware law, when a disinterested and independent board of directors acts, this Court reviews those actions under the business judgment rule, a "broadly permissive standard."[101] Where directors are interested in a transaction, however,

---

[98] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

[99] *Thermopylae Capital Partners, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *9 (Del. Ch. Jan. 29, 2016) (quoting *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011)).

[100] *See in re Morton's Rest. Grp., Inc. S'holder Litig.*, 74 A.3d 656, 658–59 (Del. Ch. 2013); *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *3 (Del. Ch. Aug. 18, 2017).

[101] *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016).

our scrutiny increases, and the transaction may be subject to entire fairness review.[102] Thus, if a board approves a transaction and "at least half of the directors who approved the transaction were not disinterested or independent," then the transaction is subject to entire fairness review.[103] Entire fairness can also apply when a controlling stockholder is conflicted or competes for consideration with fellow stockholders.[104] Where entire fairness is the standard of review, and where, as here, a plaintiff alleges facts making it reasonably conceivable that the transaction was not entirely fair to stockholders, the granting of a motion to dismiss is inappropriate, because the burden is on the defendants to develop facts demonstrating entire fairness.[105] However, even where half or more of the directors are interested, and even if a conflicted controller is present, a company can implement procedural safeguards that cleanse the transaction and regain business judgment review,

---

[102] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710–11 (Del. 1983) ("When directors of a Delaware corporation are on both sides of a transaction, they . . . [have] the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." (citing *Gottlieb v. Heyden Chem. Corp.*, 91 A.2d 57, 57–58 (Del. 1952); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 110 (Del. 1952); *Bastian v. Bourns, Inc.*, 256 A.2d 680, 681 (Del. Ch. 1969), *aff'd*, 278 A.2d 467 (Del. 1970); *David J. Greene & Co. v. Dunhill Int'l Inc.*, 249 A.2d 427, 431 (Del. Ch. 1968))).

[103] *Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *9 (Del. Ch. Feb. 29, 2016).

[104] *Larkin*, 2016 WL 4485447, at *8.

[105] *See Cumming v. Edens*, 2018 WL 992877, at *23 (Del. Ch. Feb. 20, 2018) ("the applicability of the entire fairness standard normally will preclude a dismissal of a complaint on a Rule 12(b)(6) motion to dismiss." (quoting *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at *15 (Del. Ch. July 28, 2016))).

resulting, where appropriate, in dismissal of the action.[106] The defendants asserting such defenses bear the burden of establishing them.[107]

Where entire fairness applies because of a conflicted controller, under *Kahn v. M&F Worldwide* (*MFW*),[108] a board can recover business judgment review by making the transaction contingent from inception upon the presence of a fully constituted, fully authorized special committee *and* a vote of informed and un-coerced minority stockholders.[109] Under *Corwin v. KKR Holdings LLC* (*Corwin*),[110] "absent a looming conflicted controller," approval by a fully informed, un-coerced vote of disinterested stockholders can cleanse the transaction—even where entire fairness would otherwise apply.[111] Alternatively, absent a conflicted controller, a fully-empowered, independent special committee can potentially cleanse the transaction under the rationale noted in *In re Trados Inc. Shareholder Litigation* (*Trados II*).[112]

---

[106] *See Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014) ("We hold that business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned ab initio upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders.").

[107] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018); *Corwin v. KKR Fin Holdings LLC*, 125 A.3d 304, 312 n.27 (Del. 2016).

[108] 88 A.3d 635 (Del. 2014).

[109] *See id.* at 644.

[110] 125 A.3d 304 (Del. 2015).

[111] *Larkin v. Shah*, 2016 WL 4485447, at *13 (Del. Ch. Aug. 25, 2016) (emphasis omitted).

[112] 73 A.3d 17 (Del. Ch. 2013).

Here, the Amended Complaint adequately pleads (and the Defendants do not contest) that at least half the Board lacked independence because they were interested parties in the Merger. Stanfield and McGough rolled over substantial portions of their Intersections equity into the Merger, and Loeb—where Lev serves as managing director—did the same.[113] The Plaintiff also alleges other facts that imply a lack of independence, such as Stanfield's consulting agreement, and McGough's and Loeb's receipt of convertible notes through the Convertible Note Agreement.[114] Accepting these allegations as true, I find that these three directors on the six-director Board stood on both sides of the Merger as co-purchasers with WC SACD. As such, their interests in the Merger diverged from the other stockholders, and they lacked independence.[115] Because these three constituted "at least half of the directors who approved the transaction," the Merger is subject to entire fairness review unless it was properly cleansed through procedural safeguards.[116] I note the Defendants do not argue otherwise in their Motion to Dismiss.

---

[113] Am. Compl., ¶ 76; *see also In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8 (Del. Ch. July 24, 2009) (finding director was interested who had "an ownership or employment relationship" with an entity that owned target company stock).

[114] Am. Compl. ¶¶ 70, 78.

[115] *Orman v. Cullman*, 794 A.2d 5, 29 (Del. Ch. 2002) (finding directors lacked independence when they stood to receive benefit from transaction not shared by all stockholders).

[116] *Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *9 (Del. Ch. Feb. 29, 2016).

The Plaintiff, for his part, does not assert that the Merger was subject to a controlling stockholder or stockholder group.[117] Therefore, the Defendants properly argue that even if half the Board was interested—as I have found at this pleading stage—the Merger could potentially receive business judgment review under the doctrines expounded in *Corwin* and *Trados II*.[118] The burden, however, is on the Defendants to effectively invoke these doctrines.

I accept the Plaintiff's concession that the transaction was not subject to a controller or control group, and thus cleansing under *Corwin* or *Trados II* is possible. The Amended Complaint adequately alleges, however, that the procedural safeguards instituted were inadequate to cleanse the Merger and regain business judgment review. Thus, the transaction remains subject to entire fairness review. Although the Defendants do not argue that they could withstand entire fairness scrutiny at the motion to dismiss stage, I note briefly that the Amended Complaint clears the low hurdle of pleading unfair process and price under entire fairness

---

[117] The Amended Complaint alleges that the Defendants breached their fiduciary duties "[b]y virtue of their positions as directors and/or officers of Intersections *and their exercise of control* and ownership over the business and corporate affairs of the Company." Am. Compl. ¶ 108 (emphasis added). The Amended Complaint, however, never alleges a control group or explicitly states that the Defendants exerted control. The Plaintiff clarifies this issue in his briefing: "Plaintiff does not—and never did—assert that Loeb, Stanfield and/or McGough controlled Intersections as of the Transaction." Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss the Am. Compl., D.I. 27 ("Pl.'s Answ. Br."), at 34 n.18.

[118] Alternatively, the Defendants also argue that should I find a controller present, under *MFW* the Merger is nonetheless still subject only to business judgment review. Given the fact that the Plaintiff does not assert that this is a controlled transaction, I do not consider the more difficult *MFW* standard further.

review by adequately alleging that insiders influenced the transaction to divert

merger consideration to themselves, and that the Company was sold at an unfairly

depressed price.[119]

### B. The Employment of the Special Committee Does Not Successfully Cleanse the Transaction

A corporate transaction entered by a conflicted board is subject to entire

fairness, but our case law contemplates that if there is no controller present, then a

fully constituted, adequately authorized, and independent special committee can

cleanse such a transaction.[120] This is because the true empowerment of a committee

of independent, unconflicted directors removes the malign influence of the self-

---

[119] *E.g.* Am. Compl. ¶¶ 48–55 (alleging that interested directors improperly influenced the transaction process), 80–89 (alleging the Merger was unfairly priced); *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012) (noting that entire fairness review examines fair dealing and fair price) (internal citation omitted). The Defendants focused their briefing on procedural cleansing and did not address dismissal under entire fairness review. *See* Opening Br. of Defs. Bruce L. Lev, David A. McGough, and Michael R. Stanfield in Support of Their Mot. to Dismiss the Am. Compl., D.I. 25 ("Defs.' Opening Br."), at 1–3.

[120] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 65 n.39 (Del. Ch. 2013) ("The decision not to form a special committee had significant implications for this litigation . . . If a duly empowered and properly advised committee had approved the Merger, it could well have resulted in business judgment deference."); *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *33 (Del. Ch. Apr. 14, 2017) ("If the board delegates its full power to address an issue to a committee, then the judicial analysis focuses on the committee. A decision made by a disinterested, independent and informed majority of the committee receives business judgment deference." (citing *Trados II*, 73 A.3d at 65 n.39; *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *27 (Del. Ch. May 22, 2000))); *see also Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 65 n.199 (Del. Ch. 2015) ("the full board did not approve the [merger] . . . only the Audit Committee did so. Thus, the relevant focus for determining the standard of review for the breach of fiduciary duty claim asserted against the [defendant] directors . . . is on the members of the Audit Committee, whose presumed independence, disinterestedness, and good faith Plaintiff failed to call into question for the reasons explained above. Thus, the business judgment standard would presumably govern.").

interested directors, and thus should result in business judgement review. Whether such a committee is truly empowered is a necessary question, to be reviewed practically to determine if the transaction, in fact, is untainted by fiduciary self-interest. The issue before me in this regard involves the timing of the formation of the committee. Must the committee be sufficiently constituted and authorized *ab initio*; consistent, that is, with the requirements set forth in *MFW* for cleansing a transaction in a control situation? The answer, I perceive, is yes.

> Our Supreme Court held in *MFW*:
>
> [B]usiness judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders.[121]

The Supreme Court outlines why the constitution of the committee *ab initio* is important: "when these two protections are established *up-front*, a potent tool to extract good value for the minority is established. *From inception*, the controlling stockholder knows that it cannot bypass the special committee's ability to say no."[122] The same rationale, I perceive, applies in the context of a majority-conflicted board. As our Supreme Court recently discussed in *Flood v. Synutra Int'l, Inc.*[123]:

---

[121] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014).

[122] *Id.* (emphasis added).

[123] 195 A.3d 754 (Del. 2018).

The key concern of *MFW* was ensuring that controllers could not use the conditions [i.e. the procedural protections of a majority-of-the-minority vote and a functional special committee] as bargaining chips during economic negotiations . . . [t]he essential element of *MFW*, then, is that these requirements cannot be dangled in front of the Special Committee, when negotiations to obtain a better price from the controller have commenced, as a substitution for a bare-knuckled contest over price.[124]

I find the same concerns apply in the instant context, where there is no controlling stockholder but the board is conflicted. The acquirer—as well as any interested directors—must know from the transaction's inception that they cannot bypass the special committee. Insiders in particular, standing on both sides of the transaction, may be tempted to exercise the opportunity and influence their positions afford them to move the transaction favorably toward their own interests. Even in a non-control setting, commencing negotiations prior to the special committee's constitution may begin to shape the transaction in a way that even a fully-empowered committee will later struggle to overcome. In that scenario, a "bare knuckle contest over price" is unlikely, and the existence of the committee is insufficient to replicate an arms-length transaction. Consequently, it is also insufficient to revive business judgement review.

---

[124] *Id.* at 762–63.

In *Flood*, our Supreme Court determined that "from the beginning" means that the required condition[125] must exist "before any substantive economic negotiations begin."[126] The Supreme Court opted for this interpretation rather than a bright-line rule, such as requiring that the condition be contained in the first offer.[127] Still more recently, in *Olenik v. Lodzinski*,[128] the Court provided insight into what might constitute "substantive economic negotiations." In *Olenik*, the parties began discussing a transaction in November 2015.[129] The next month, they signed a confidentiality agreement and conducted due diligence.[130] Discussions were put on hold for a few months, then resumed.[131] The parties proceeded to engage in a joint valuation exercise to provide high and low values for the company.[132] The Supreme Court found that "[w]hile some of the early interactions . . . could be fairly described as preliminary discussions outside of *MFW*'s 'from the beginning' requirement," the complaint adequately pled that "the preliminary discussions

---

[125] That is, an empowered, fully functioning special committee.

[126] *Id.* at 762. The Supreme Court's discussion of the topic spans pages 760–66.

[127] *Id.* at 762.

[128] 208 A.3d 704 (Del. 2019).

[129] *Id.* at 716.

[130] *Id.*

[131] *Id.* at 716–17.

[132] *Id.* at 717.

26

transitioned to substantive economic negotiations when the parties engaged in a joint exercise to value [the acquirer and target company]."[133]

The Supreme Court found that "it is reasonable to infer that these valuations set the field of play for the economic negotiations to come by fixing the range in which offers and counteroffers might be made."[134] And, "[a]ccording to the complaint, that generally turned out to be the case."[135] The first offer landed just under the low valuation, and the final price landed just under the high valuation: in other words, the valuations conducted prior to the special committee's constitution formed a price collar.[136] The pleading-stage inference was that this counted as substantive economic discussions.[137]

Applying the guidance provided in *Olenik,* I find here that the Committee was not properly constituted from the Merger's inception in a way that could take advantage of the cleansing effect proposed in *Trados II*.

Here, the iSubscribed Investor Group first contacted the Board on September 14, 2018.[138] At that point, the Committee—previously constituted to review

---

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] Am. Compl., ¶¶ 48–49.

financial options—had been abandoned.[139] The 14D-9 details what occurred next. On September 18, Stanfield and Lev met with the iSubscribed Investor Group "to provide an overview of the Company and its financing needs, outline in broad terms how an acquisition of the Company might be approached, and gain an understanding of the iSubscribed Investor Group's intentions."[140] Following this meeting, on September 20, "iSubscribed entered into a non-disclosure agreement with [the Company] and began a detailed due diligence process."[141] iSubscribed's investment banker called Lev to discuss the potential acquisition on September 25.[142]

On September 26, the iSubscribed Investor Group formed WC SACD, and the next day a WC SACD representative met with Stanfield.[143] According to the Amended Complaint, without "authority to negotiate on behalf of the Company or Board, Stanfield effectively told WC SACD that the Intersections Board would be receptive to an acquisition offer of $3.50 to $4.00 per share."[144] The 14D-9 maintains that Stanfield only gave his personal view of what price the directors would be amenable to "after emphasizing he did not have authority to negotiate on

---

[139] *See id.* ¶ 55.

[140]14D-9, at 16.

[141] *Id.*

[142] *Id.* at 17.

[143] *Id.*

[144] Am. Compl., ¶ 53.

behalf of the Company."[145] Acquisition discussions then continued through the first week of October.[146] At that point, the Board reconstituted the Committee, and as of the time WC SACD submitted its first offer, on October 9, the Board had "determined that it would not recommend a potential transaction . . . for approval by the Company's stockholders, or otherwise approve a potential transaction . . . without a prior favorable recommendation by the Special Committee."[147]

The Defendants point out that in *Olenik*, the parties' involvement, pre-committee, was more extensive than here. There, the parties engaged in several months of due diligence and general acquisition discussions, while here it was weeks. There, the parties engaged in a joint valuation process to "fix[] the range" of values for the company and thereby "set the field of play for the economic negotiations to come."[148] Here, Stanfield, Intersections' Chairman and CEO, told WC SACD to base an offer on the "independent value" rather than the trading price and gave a range he thought would engage the Board.[149]

Acknowledging these factual differences, I find that at the pleading stage I can infer that this pre-Committee involvement, while more limited than in *Olenik*,

[145] 14D-9, at 17.

[146] *Id.* at 16.

[147] *Id.* at 17.

[148] *Olenik v. Lodzinski*, 208 A.3d 704, 717 (Del. 2019).

[149] 14D-9, at 17.

29

likewise set the stage for future economic negotiations. This inference is strengthened by the fact that, as the Amended Complaint alleges, WC SACD came in at $3.50, the exact lower end of Stanfield's suggestion, and raised its offer, once, to $3.68, just under the middle of the range he provided. And that was where the Merger closed.[150] Making the inference in favor of the Plaintiff, as I must, I find it conceivable that these discussions prior to the Committee's reconstitution essentially formed a price collar that "set the field of play for the economic negotiations to come."[151] Discovery may demonstrate otherwise. But the Amended Complaint adequately pleads the existence of substantive economic negotiations, pre-Committee, that raises a pleading-stage inference that these discussions deprived the Committee of the full negotiating power sufficient to invoke the business judgement rule.

To summarize, I find that to effectively cleanse a transaction under *Trados II* and its progeny, the special committee must be constituted *ab initio*, as in *MFW*. As described in *Flood* and examined in *Olenik*, this requires the committee's empowerment prior to "substantive economic negotiations," which include valuation and price discussions if such discussions "set the field of play for the

---

[150] Am. Compl. ¶¶ 53, 56.

[151] *Olenik*, 208 A.3d at 717. *Olenik* also notes the well-known phenomenon of "anchoring," by which "a starting value biases future adjustments toward that initial value." *Id.* (citing *Amos Tversky & Daniel Kahneman, Judgment under Uncertainty: Heuristics and Biases*, 185 *Science* 1124, 1128–30 (1974)).

economic negotiations to come."[152]   The transaction here did not meet this requirement because the Amended Complaint adequately pleads that pre-Committee discussions plausibly created a price collar for the Merger and thus constituted substantive economic discussions.[153]

### C. Intersections' Disclosures do not Cleanse the Transaction under Corwin Because They are Materially Incomplete or are Materially Misleading

Next, the Defendants argue that the transaction is cleansed under *Corwin* because there is no controlling shareholder and the 14D-9 adequately discloses all material information, leading to an effective favorable vote of the unconflicted shares.   Under *Corwin*, where a transaction without a conflicted controller "is approved by a fully informed, un-coerced vote of the disinterested stockholders, the business judgment rule applies."[154]   In such a case, the informed and empowered corporate electorate has accepted the transaction in light of, and in spite of, any conflicts of interest or other fiduciary defects, and this Court will not second-guess such an informed vote by the corporate owners.

In determining the materiality of missing (or misinforming) information at the pleading stage, the Court asks whether "[i]t is reasonably conceivable that Plaintiff

---

[152] *Id.*

[153] Because of this finding, I do not reach the Plaintiff's remaining contentions that the Committee was ineffective.  *See* Am. Compl., ¶¶ 56–66.

[154] *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 309 (Del. 2016).

will be able to demonstrate a substantial likelihood that . . . reasonable . . . stockholders would have found this information to be important when deciding how to vote on the Merger."[155] If the information is the type that would be material—in other words, if it would "significantly alter the 'total mix' of information made available"[156]—then "failure to disclose it in the Proxy undermines the cleansing effect of the stockholder vote under *Corwin*."[157] Counterbalancing the mandate for complete disclosure, of course, is recognition of the risk of inundating the stockholder with so much information that the proxy clouds, rather than clarifies, the stockholder's decision.[158] A complaint does not state a disclosure violation by

---

[155] *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *13 (Del. Ch. Mar. 31, 2017); *see also In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 899 (Del. Ch. 2016) (materiality requires that "there is a substantial likelihood that a reasonable shareholder would consider [the omitted information] important in deciding how to vote."); *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (omissions must "have assumed actual significance in the deliberations of the reasonable shareholder.").

[156] *Morrison v. Berry*, 191 A.3d 268, 283 (Del. 2018) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[157] *In re Saba*, 2017 WL 1201108, at *13.

[158] *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 749 (Del. Ch. 2016) ("Assessing materiality is a difficult practice that requires balancing the benefits of additional disclosures against the risk that insignificant information may dilute potentially valuable information." (internal citation omitted)); *In re Plains Expl. & Prod. Co. S'holder Litig.*, 2013 WL 1909124, at *8 n.74 (Del. Ch. May 9, 2013) ("Balanced against the requirement of complete disclosure is the pragmatic consideration that creating a lenient standard for materiality poses the risk that corporations will bury the shareholders in an avalanche of trivial information a result that is hardly conducive to informed decisionmaking." (quoting *Skeen v. Jo–Ann Stores, Inc.*, 1999 WL 803974, at *4 (Del. Ch. Sept. 27, 1999), *aff'd*, 750 A.2d 1170 (Del. 2000) (internal citation omitted))); *TCG Sec., Inc. v. S. Union Co.*, 1990 WL 7525, at *7 (Del. Ch. Jan. 31, 1990) ("a reasonable line has to be drawn or else disclosures in proxy solicitations will become so detailed and voluminous that they will no longer serve their purpose.").

noting picayune lacunae or "tell-me-more" details left out.[159] Nonetheless, at this pleading stage I must decline to employ the business judgement rule so long as it is reasonably conceivable that the Amended Complaint has alleged misleading or missing disclosures in the Proxy that are material.

The Defendants argue the Company's 14D-9 discloses all material facts, and thus the well-informed stockholders had their choice between attractive alternatives: on the one hand, a 112% premium over trading price; on the other hand, maintaining an equity stake in a company about to launch a historic flagship product.[160] By contrast, the Plaintiff argues that the 14D-9 actually suggested to the stockholders that if they did not approve the Merger, control would transfer to WC SACD. The Plaintiff also alleges missing material information regarding the Transaction and advisors. I find the Amended Complaint adequately alleges that the 14D-9 is materially incomplete, or materially misleading to stockholders, regarding the potential transfer of control. In addition, I find the 14D-9 omits material facts regarding the Committee's engagement with financial advisors.[161]

---

[159] *See In re Delphi Fin. Grp. S'holder Litig.*, 2012 WL 729232, at *18 (Del. Ch. Mar. 6, 2012).

[160] Defs.' Opening Br., at 34–36.

[161] Because of my decision here, I need not address other grounds on which the Plaintiff alleges that the Proxy was insufficient. *See* Am. Compl., ¶¶ 99–100.

33

### 1. The 14D-9 Fails to Adequately Disclose WC SACD's Appointment Rights if the Stockholders Reject the Merger

"Under Delaware law, when a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression."[162] Put differently, "[p]artial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations."[163] A variation of this concept has sometimes been called the "buried facts" doctrine and rests on the idea that "[d]isclosure is inadequate if the disclosed information is 'buried' in the proxy materials."[164] Typically, a stockholder's desire that information be presented earlier in the proxy or that it receive more emphasis will not suffice to demonstrate a material inadequacy.[165] If, however, a stockholder

---

[162] *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018); *see also In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007) ("Once a board broaches a topic in its disclosures, a duty attaches to provide information that is 'materially complete and unbiased by the omission of material facts.'" (quoting *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. 2002))).

[163] *Appel*, 180 A.3d at 1064.

[164] *Vento v. Curry*, 2017 WL 1076725, at *3 (Del. Ch. Mar. 22, 2017) (quoting *Weingarden v. Meenan Oil Co.*, 1985 WL 44705, at *3 (Del. Ch. Jan. 2, 1985)).

[165] *See Weingarden v. Meenan Oil Co.*, 1985 WL 44705, at *3 (Del. Ch. Jan. 2, 1985) ("The 'buried facts' doctrine cannot be invoked here . . . Inasmuch as the disclosure was made under an appropriate heading and cross referenced at the beginning of the proxy statement, plaintiffs' allegation that these disclosures should have been made earlier in the proxy statement is without merit.").

is sent on a "scavenger hunt" to dig up information one would expect to be stated clearly and in one place, the disclosure may be inadequate.[166] In other words, proxies should be lucid, and not a game of Clue.[167]

The 14D-9 discloses a contractual right that WC SACD gained as a part of the Note Purchase Agreement:

> If there is a termination of the Merger Agreement . . . subject to NASDAQ listing requirements (including NASDAQ Listing Rule 5640), a majority of the Company Board will resign and Parent will have the right to designate directors to fill such vacancies (provided that one director so designated shall be an independent director designated by Loeb Holding Corporation) and to appoint the Chief Executive Officer of the Company.[168]

The 14D-9 also discloses that the Committee considered WC SACD's right in determining whether to recommend the Merger:

> The Special Committee . . . also considered the following countervailing factors: . . . the fact that the Note Purchase Agreement provides that . . . in the event the Merger Agreement is terminated, other than by reason of a breach of such agreement by Purchaser, Purchaser has the right, subject to NASDAQ listing requirements and Commission rules, to designate a majority of the members of the Board

---

[166] *See Vento*, 2017 WL 1076725, at *3 (finding disclosure inadequate when material facts regarding "a financial advisor's potential conflicts of interest" were located in multiple public documents); *see also Blanchette v. Providence & Worcester Co.*, 428 F. Supp. 347 (D. Del. 1977) (finding voting rights disclosures inadequate when the material voting provisions were disclosed clearly upfront but the fact that they had been invalidated was in a footnote near the end of the disclosure).

[167] *See Appel*, 180 A.3d at 1064 (noting that proxies are not intended to function as mysteries for stockholders to solve).

[168] Am. Compl., ¶ 91; 14D-9, at 10.

of Directors and appoint the chief executive officer of the Company[.][169]

Both these disclosures state succinctly that a rejection of the proposed Merger would result in a change of control in favor of WC SACD, leaving stockholders as equity holders in a controlled entity. The Proxy also provides that such a change in control is subject to NASDAQ Rule 5640. The 14D-9 further discloses what NASDAQ Rule 5640 is and its effect:

> NASDAQ Listing Rule 5640 . . . provides that voting rights of existing shareholders of publicly traded common stock registered under Section 12 of the Exchange Act cannot be disparately reduced or restricted through any corporate action or issuance. Thus, under current NASDAQ interpretative guidance, should a company allow an investor to nominate or designate directors at a level which is disproportionately greater than its aggregate ownership position, NASDAQ would view that corporate action as disparately reducing the voting power of the other shareholders.[170]

Thus, under the NASDAQ rules, even though WC SACD had a contractual right to appoint a majority of the Board, it could only exercise this right commensurate with its ownership. To put it simply (as the Proxy itself could have): Under Rule 5640, WC SACD could only appoint a majority of the Board if it held a majority of the stock.[171]

---

[169] *Id.* ¶ 91 n.36; 14D-9, at 25.

[170] 14D-9, at 10.

[171] The Defendants argue that because the explanation of the rule is relatively clear, this disclosure claim is comparable to a recent opinion in which this Court found failure to explain a clause was immaterial because the clause "speaks for itself; it required no explanation." *Zalmanoff v. Hardy*, 2018 WL 5994762, at *4 (Del. Ch. Nov. 13, 2018), *aff'd*, 211 A.3d 137 (Del. 2019). The clause

The Intersections stockholder, assuming she read these disclosures correctly, would then need to discern WC SACD's ownership stake at the effective time to determine whether WC SACD would be permitted to appoint a majority of the Board under its contractual right.[172] The 14D-9 does not disclose this ownership percentage outright; however, as Defendants point out, the information needed to make the calculation can be located entirely within the Proxy materials.

The stockholder can calculate the ownership and apply this information by following these steps:[173]

- The stockholder can glean the total number of outstanding shares pre-Merger from the first page of the 14D-9: 24,428,246.[174]
- Then, the stockholder can review the Offer to Purchase for Cash All Outstanding Shares of Common Stock of Intersections Inc. (the "Offer to Purchase").[175] The Offer to Purchase is included as Exhibit (a)(1) to the 14D-9, and was "[i]ncluded in materials delivered to stockholders of the Company."[176]
- Page 17 of the Offer to Purchase describes the conversion aspect of the Note Purchase Agreement. From this, the stockholder can learn that

---

there was a "best efforts" clause that merely stated the company was required to use best efforts to close the transaction. *Id.* In my view, that situation is not comparable to the application of a NASDAQ listing rule to a contractual obligation where the Proxy lacks a reasonable presentation of information needed for the analysis.

[172] The Amended Complaint states that the "Notes would automatically convert into shares of Intersections common stock immediately prior to the consummation of the Transaction." Am. Compl., ¶ 72.

[173] These steps are outlined, in varied forms, in the parties briefing. *See* Pl.'s Answ. Br., at 41–44; Defs.' Opening Br., at 34–41.

[174] 14D-9, at 1 ("As of November 28, 2018, there were 24,428,246 Shares outstanding.").

[175] Covert Aff., Ex. D, Offer to Purchase for Cash All Outstanding Shares of Common Stock of Intersections Inc. ("Offer to Purchase").

[176] 14D-9, at 52, 54.

WC SACD gained the right to automatically convert its Notes into 13,215,859 shares of common stock.[177]

- Page 17 of the Offer to Purchase also conveys that all of the Notes in the Note Purchase Agreement are convertible into 14,977,974 shares of common stock.[178]

- From here, the stockholder can make the calculation: divide WC SACD's number of converted shares by the sum of the outstanding shares and the total number of converted shares: $13,215,859 / (24,428,246 + 14,977,974) = .3354$.[179]

- Thus, the stockholder can conclude that by exercising its conversion right in the Note Purchase Agreement, WC SACD can convert into approximately a 33.54% ownership stake.[180]

- Armed with WC SACD's ownership percentage post-conversion, the stockholder can conclude that Rule 5640 would likely limit WC SACD's contractual right to appoint a majority of directors to its ownership stake of approximately one-third because otherwise "NASDAQ would view that corporate action as disparately reducing the voting power of the other shareholders."

Thus, a truly diligent Intersections stockholder could conclude from the 14D-9 and the exhibits provided that if she votes against the transaction, as long as NASDAQ Rule 5640 applies—and no exceptions to the rule apply[181]—her "no" vote will not

---

[177] Offer to Purchase, at 17.

[178] *Id.*

[179] Defs.' Opening Br., at 37 n.11.

[180] *Id.* The Stockholder will also need to determine that this 33.54% is the applicable number for analysis under the NASDAQ Rules, rather than the 62.4% number, which is the percentage of the common stock of which WC SACD was the "Beneficial Owner" as of the Merger. 14D-9, at 48.

[181] NASDAQ Rule 5640 permits an exception when a company allows appointment rights disproportional to ownership "where necessary to rescue a company in financial distress." Nasdaq Staff Interpretation Letter 2010-15, available at https://listingcenter.nasdaq.com/assets/ StaffInterpLtrs20111231.pdf ("[W]e have determined to grant an exception from the Voting Rights Rule [5640] as it applies to the voting power of the preferred stock because both that rule and former SEC Rule 19c-4 permit such an exception where necessary to rescue a company in financial distress."). The Defendants argue this exception would not apply because although they argue that the Company was in "considerable financial distress," they argue that the appointment

result in the change of control that both the Note Purchase Agreement and the 14D-9 state is WC SACD's contractual right.

The question is whether this disclosure scheme is adequate to fulfill the Company's duty to disclose all material facts and not materially mislead the stockholder. While the stockholder must be adroit to assemble the information, everything is included in materials sent to the stockholders.[182] The Defendants cite our case law, in which this Court has held that "mere failure to organize the documents to meet [the] plaintiff's best case scenario for maximizing the clarity of the information presented does not constitute the kind of omission or misleading half-truth" necessary for a materially inadequate disclosure.[183] Conversely, the Plaintiff notes that this Court has also held that "[d]isclosures are not supposed to

---

rights would arise *after* the Note Purchase Agreement relieved that distress. *See* Defs.' Opening Br., at 43; Defs.' Reply Br. in Support of Their Mot. to Dismiss the Am. Compl., at 22–23 ("Defs.' Reply Br."). However, the appointment rights were also bargained for as a part of the contract that, per the Defendants, relieved the Company of its financial distress. Suffice it to say that it is unclear how and whether this exception would apply (an issue upon which I am unqualified to opine), and that the exception is not disclosed in the 14D-9.

[182] *See Wolf v. Assaf*, 1998 WL 326662, at *3 (Del. Ch. June 16, 1998) ("Under no reasonable interpretation of the facts plead could the placement of the disclosure about the [allegedly omitted information] in the 10-K accompanying the proxy statement rather than in the statement itself serve as the basis for a disclosure violation.").

[183] *Id.*

take the form of a scavenger hunt,"[184] and that a stockholder should not be required to "piece together the answer from information buried" in the disclosures.[185]

In this situation, and at this pleading stage, I find it reasonably conceivable that the 14D-9 fails to adequately disclose material facts about WC SACD's appointment rights in case of the Merger's termination. Clearly, a potential that a "no" vote could lead to ownership of equity in a newly-controlled corporation is material to a stockholder's decision on whether to sell her shares.[186] The possibility that opposing the Merger will result in a newly controlled corporation is certainly part of the "total mix" of information a reasonable stockholder would take into account when making her decision.

Here, the statements in the 14D-9 on their face suggest to a reasonable stockholder that WC SACD has a contractual right to control the Board if the vote is unfavorable. While it states that NASDAQ Rules apply and points to Rule 5640, it leaves the stockholder on her own to look past the impression of a contractual right to control that the 14D-9 creates, and to discern that the application of Rule 5640

---

[184] *Ark. Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *24 (Del. Ch. Jun. 28, 2019).

[185] *Vento v. Curry*, 2017 WL 1076725, at *3–4 (Del. Ch. Mar. 22, 2017).

[186] The Defendants appear to argue that stockholders would not find the change in control material because a change in control would not deprive them of Intersections' alleged imminent value increase. *See* Defs.' Opening Br., at 39. This, to me, is a non-sequitur. I assume the Company had a bright future, but fail to see how this bears on the obvious conclusion that a transition to a controlled company is a material stockholder concern.

might supersede this contractual outcome. Then, without guidance from the 14D-9, the stockholder must track down stock ownership numbers in the exhibits to complete the analysis.[187]

For an issue as fundamental to a stockholder as an apparent decision between selling or holding subject to a change of control, I find the disclosure regarding WC SACD's appointment rights was plausibly "presented in an ambiguous, incomplete, or misleading manner, [and] is not sufficient to meet a fiduciary's disclosure obligations."[188] Either the stockholder would be unable to follow the necessary steps to conduct her analysis, in which case the disclosure is plausibly coercive because it suggests on its face a sell-or-change-of-control choice,[189] *or*, in order to find out whether the vote is coercive, the stockholder is required to undergo the sort of fact-finding expedition into exhibits and listing rules that our case law discourages.

---

[187] As mentioned, the 14D-9 did not disclose the exceptions to NASDAQ Rule 5640, so unless the stockholder does independent research into the listing rules, she will be unaware that NASDAQ has in the past permitted waivers of Rule 5640's limitations in cases where the appointment rights were granted to resolve a company's financial distress, a situation that—despite the Defendants' protests—arguably applies here.

[188] *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018).

[189] Coercion is present "where stockholders are induced to vote 'in favor of the proposed transaction for some reason other than the economic merits of that transaction.'" *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *14 (Del. Ch. Mar. 31, 2017) (quoting *Williams v. Geier*, 671 A.2d 1368, 1382–83 (Del. 1996)). Here, the misled stockholder would arguably be induced to vote in favor of the Merger not for its economic merits but to avoid the loss of any future merger premiums that could result from the change in control.

## 2. The 14D-9 Omits Material Information Regarding the Prior Financial Advisor

In addition to the appointment rights issue, I find it reasonably conceivable that missing information regarding the exit of the first financial advisor hired to evaluate the acquisition would have been material to a reasonable stockholder. The Defendants point out that our law does not entertain "tell me more" disclosure claims where adequate disclosures have already been provided.[190] The compressed timing of this transaction and the fairness opinion associated with it, however, create a context in which information regarding a hired financial advisor that walks away becomes plausibly material. Our Supreme Court has held that in making disclosures, a company ought to put itself in the shoes of what its own decision-makers would want to know: "stockholders should not be expected to speculate about facts any reasonable board advisor or director would find to be of importance."[191] The missing information here is likely one such fact.

According to the Amended Complaint, the Committee had recently employed Houlihan Lokey to advise it on potential financing transactions.[192] Shortly after failing to enter such a transaction, the Board revived the Committee to consider WC

---

[190] *See In re Delphi Fin. Grp. S'holder Litig.*, 2012 WL 729232, at *18 (Del. Ch. Mar. 6, 2012).

[191] *Appel*, 180 A.3d at 1064.

[192] Am. Compl., ¶ 45.

SACD's interest in an acquisition.[193] The Committee hired a new advisor—a "nationally recognized investment banking firm" presumably not Houlihan Lokey—only *after* it received WC SACD's final proposal for the transaction.[194] Thus, the new financial advisor it hired after receiving the proposal walked into a nearly fully formed transaction and merely needed to approve it. A few days later, however, the new financial advisor mysteriously terminated the engagement.[195] After a two-day search, the Company hired North Point, which provided a fairness opinion eight days later.[196]

The Defendants argue that disclosures on this topic would be immaterial given the extensive disclosures regarding the North Point fairness opinion. I disagree. Houlihan Lokey was informed about the Company's circumstances, but for undisclosed reasons was not retained. Instead, a second, "nationally recognized" financial advisor accepted the Committee's engagement. Presumably, it reviewed the Transaction in preparation to provide an opinion. *It then walked away.* An innocent inference is that it declined to participate due to unforeseen conflicts or other logistics that made it impossible to turn a fairness opinion around in a

---

[193] *Id.* ¶ 55.

[194] *Id.* ¶ 63. The Proxy, I note, implies that the termination was a mutual decision of the advisor and the Committee.

[195] *Id.*

[196] *Id.* ¶¶ 64–65.

compressed timeframe. The Plaintiff's inference is that the financial advisor found it could not approve the Transaction as it stood and so it walked away, and the Company chose not to disclose its disapproval. Either way, in evaluating the Transaction, the Board and North Point would themselves want to know why a well-known financial advisor voluntarily terminated an engagement and walked away from a fully formed transaction. It follows that so would a reasonable stockholder. The fairness opinion is perhaps the most material factor in a "sell/don't sell" binary decision, and the reasons for going to a second—arguably a third—financial advisor here, in the context of a near-completed deal and a tight schedule, are not trivial. I do not find, given these unique circumstances, that the Plaintiff is merely asking "why" and requesting trivial information.[197] I find it reasonably conceivable that such disclosures, not made here, are material.

## III. CONCLUSION

For the forgoing reasons, I find that the Transaction, approved by a board with half its directors standing on both sides, is subject, based on this pleading-stage record, to entire fairness review. The Plaintiff has pled facts making it reasonably conceivable that the Transaction was not entirely fair. Accordingly, the Defendants' Motion to Dismiss is denied. An appropriate Order is attached.

---

[197] *See In re Plains Expl. & Prod. Co. S'holder Litig.*, 2013 WL 1909124, at *10 (Del. Ch. May 9, 2013) (rejecting claims of the "tell me more variety" in the face of adequate disclosures) (citing *In re Delphi Fin. Grp. S'holder Litig.*, 2012 WL 729232, at *18 (Del. Ch. Mar. 6, 2012)).

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| LANCE SALLADAY, On Behalf of Himself and All Other Similarly Situated Former Stockholders of INTERSECTIONS, INC., | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0048-SG |
| | ) | |
| BRUCE L. LEV, DAVID A. MCGOUGH, and MICHAEL R. STANFIELD, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

AND NOW, this 27th day of February, 2020, for the reasons set forth contemporaneously in the attached Memorandum Opinion dated February 27, 2020, IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss is DENIED.

IT IS SO ORDERED.

<u>/s/ Sam Glasscock III</u>

Vice Chancellor